Exhibit A

To State Farm's Letter Dated June 8, 2007

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE      :
INSURANCE COMPANY,                :
                                  :
                                  :    **MEMORANDUM**
              Plaintiff,          :    **& ORDER**
                                  :
      -against-                   :    **04-CV-2609 (NG)**
                                  :
SEMION GRAFMAN, et al.,           :
                                  :
              Defendants.         :
-------------------------------------------------------x

GOLD, STEVEN M., *United States Magistrate Judge*:

### INTRODUCTION

Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") moves for

leave to amend its complaint pursuant to Federal Rule of Civil Procedure 15(a), seeking to join

additional defendants and claims for relief. Plaintiff, a nationwide automobile insurer, brings this

action alleging that retail and wholesale medical equipment suppliers and the corporate owners

and operators of these supply businesses conspired to defraud it by exploiting New York's No-

Fault laws, N.Y. INS. LAW § 5101 *et seq.*, and regulations, N.Y. COMP. CODES RULES & REGS.,

tit. 11, § 65 *et seq.* In the proposed amended complaint, plaintiff seeks to broaden the scope of

the alleged conspiracy by joining seventy new defendants it alleges participated in the fraudulent

scheme detailed in the current complaint. The Honorable Nina Gershon referred plaintiff's

motion to me for a decision pursuant to 28 U.S.C. § 636(b)(1)(A).[1] Docket Entry 175. For the

---

[1] A magistrate judge has the authority to decide a motion to amend for decision pursuant
to 28 U.S.C. § 636(b)(1)(A). Although the Second Circuit has not specifically addressed whether
a magistrate judge has such authority, the weight of the authority in this Circuit is that a motion
to amend is non-dispositive. *See N. Assurance Co. of Am. v. Square D. Co.*, 201 F.3d 84 (2d Cir.
2000) (noting that the magistrate judge had decided the motion to amend without questioning the
magistrate judge's authority to do so); *Lyondell-Citgo Refining, LP v. Petroleos de Venezuela,*

reasons stated below, plaintiff's motion is granted, although only to the limited extent discussed below.

## BACKGROUND

In the original and proposed amended complaints, plaintiff seeks damages for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d), common law fraud, and unjust enrichment. State Farm contends that it has paid almost $9 million in fraudulent claims to the defendants named in its proposed amended complaint. Pl. Mem. p. 5.[2] Plaintiff also seeks a declaratory judgment against those defendants who continue to submit claims to State Farm. Defendants have asserted counter-claims of over $2 million for unpaid insurance benefits. Defendants' Letter dated Mar. 9, 2007, at 5, Docket Entry 224.

State Farm alleges in its original and proposed amended complaints that certain defendants submitted fraudulent charges to plaintiff for durable medical equipment supplies ("Supplies"). State Farm contends that the charges were fraudulent because a) they were based on grossly inflated prices that were more than what the defendants actually paid, b) the Supplies were not actually provided to individuals, and/or c) the Supplies were not medically necessary. More specifically, in the proposed amended complaint ("PAC"), State Farm alleges that

> "[i]n each and every claim submitted to State Farm, defendants
> knowingly have made some or all of the following

---

*S.A.*, 2005 WL 883485 (S.D.N.Y. Apr. 14, 2005); *Credit Suisse First Boston LLC v. Coeur d'Alene Mines Corp.*, 2005 WL 323714, at *2-3 (S.D.N.Y. Feb. 10, 2005); *Vandewalker v. Quandt's Food Serv. Distribs., Inc.*, 934 F. Supp. 42, 48 (N.D.N.Y. 1996). Thus, the "clearly erroneous or contrary to law" standard set forth in Federal Rule of Civil Procedure 72(a) governs any objections to this Order.

[2] "Pl. Mem." refers to Plaintiff's Memorandum of Law Seeking Leave to File the First Amended Complaint, Docket Entry 186.

misrepresentations:

(a)      deliberately omitted basic information about the Supplies,
like the manufacturer, make, model, size, features or functions,
and/or provided information about the Supplies that is completely
meaningless in determining the true kind and quality of any
specific item, or an appropriate charge:

(b)      made material misrepresentations that the costs that the
Retail Defendants purportedly incurred in purchasing Supplies
from wholesalers were legitimate costs necessarily incurred
through bona fide arms-length transactions in the competitive
marketplace when in fact the prices reflected on the invoices were
many times greater than the prices actually paid to the wholesalers;

(c)      provided generic, boilerplate prescriptions forms and letters
of medical necessity which purported to reflect Supplies ordered by
a physician based on medical necessity and the independent
medical judgment of the prescriber when, in fact, Supplies were
being ordered through Clinics that were secretly owned and
controlled by non-physicians who influenced the medical decisions
of the prescriber and/or provided prescriptions and letters of
medical necessity in exchange for cash kickbacks;

(d)      repeatedly re-submitted to State Farm the same wholesale
invoices to support charges for items purportedly provided to
numerous insureds;

(e)      purported to provide items that were more sophisticated
and expensive than those that had been prescribed; and

(f)      purported to provide custom fabricated LSOs [lumbar-
sacral (lower back) supports] that were never provided.

PAC ¶ 27.[3]  *See also* Compl. ¶ 70.

A brief explanation of New York insurance law and regulations elucidates the alleged

fraudulent scheme.  Under New York law, an individual injured in an automobile accident may

assign his right to No-Fault benefits to providers of medically-necessary supplies and valid

medical clinics that provide treatment.  PAC ¶ 12.  Pursuant to New York's insurance regulations

in effect prior to October 6, 2004, a provider of Supplies was reimbursed up to 150% of its

documented costs for durable medical equipment or 155% of the Medicaid fee schedule for

---

[3] "PAC" refers to plaintiff's Proposed Amended Complaint, Docket Entry 185.

3

orthotics.[4]  *Id.* ¶¶ 9-10.  Since October 6, 2004, a provider has been entitled to the maximum

permissible charge under the state Medicaid program.  *Id.* ¶ 11.  Plaintiff alleges that certain

retailers (the "Retail Defendants") and wholesalers (the "Wholesale Defendants") exploited this

system by creating false invoices reflecting prices for Supplies that were much higher than the

actual prices paid.[5]  State Farm contends that the Retail and Wholesale Defendants shared in the

fraudulent profits from this scheme.

    The original complaint focused on an alleged conspiracy between the Retail Defendants,

who submitted claims for Supplies to State Farm, and the Wholesale Defendants, who provided

Supplies and inflated invoices to the Retail Defendants.  The complaint named sixteen retail and

wholesale corporations and eighteen individuals who owned or operated them.

    In its proposed amended complaint, State Farm seeks to expand on the allegations in its

original complaint.[6]  The PAC now alleges participation in the fraudulent scheme by five groups

---

    [4] Generally, durable medical equipment includes items such as cervical pillows, egg crate
mattresses, and massagers, which are medically-necessary items used by an individual in his
home to aid in the healing process after an injury.  Orthotics include cervical collars, back and
neck braces, and the like.  PAC ¶ 8.

    [5] A simple example demonstrates State Farm's allegation of fraud.  Two common items
of durable medical equipment are massagers and TENS units (transcutaneous electrical nerve
stimulators).  PAC ¶ 8.  According to the Affidavit of Yuri Savransky, an owner of a former
retail medical supply business who was in business with some of the individual defendants
named in the complaint, he paid $8-10 for a massager and $18-22 for a TENS unit.  PAC Ex. 9,
¶ 19.  These prices also correspond to the prices on invoices from a non-party wholesaler.  PAC
Ex. 15.  State Farm alleges, however, that it received claims with invoices reflecting prices at ten
to twenty times that amount.  *See, e.g.*, PAC Ex. 19 (massager billed at $75-102 and TENS
unit billed at $280-$402).  If a retailer paid $8 for a massager but bills $75 to State Farm, who pays
$112.50 as required by the earlier insurance regulations, the retailer makes a profit of $104.50,
thirteen times the purchase price, on one massager.

    [6] Plaintiff originally argued that the entry of default against six defendants (Aleksey
Pugach, Bethel Equipment, Inc., Grafman Quality Products, Inc., Seaside Wholesale Ltd.,

of defendants: 1) Wholesale Defendants, 2) Retail Defendants, 3) Check Cashing Defendants, 4) Fraudulently Incorporated PCs, and 5) Paper Owner Defendants. As in the original complaint, plaintiff alleges in the PAC that the Wholesale Defendants created inflated invoices for Supplies for the Retail Defendants, who in turn submitted the inflated invoices to State Farm for reimbursement. PAC ¶ 18. State Farm now also alleges that, in furtherance of the scheme, the Retail Defendants issued checks to the Wholesale Defendants reflecting the inflated prices, and used the checks to demonstrate to State Farm the prices they paid for Supplies. PAC ¶ 19. The Wholesale Defendants then cashed the checks received from the Retail Defendants, using the services of the Check Cashing Defendants (who allegedly knew that the checks were part of a health care fraud scheme), and then secretly paid the Retail Defendants a kickback to compensate them for paying the exorbitantly inflated prices for Supplies. *Id.*

The new complaint also charges that certain defendants induced licensed doctors, referred to as "the Paper Owner Defendants," to open medical clinics which non-doctors secretly owned and controlled in violation of New York law. PAC ¶ 1(b). State Farm alleges that the Paper Owner Defendants and their clinics, the "Fraudulently Incorporated PCs," defrauded State Farm because, not being truly owned by doctors, the clinics were not entitled to reimbursement for services and Supplies under New York law. *See* N.Y. COMP. CODES RULES & REGS., tit. 11,

---

Tristate AJA Surgical Supply, Inc., and Unique Distributors, Inc.) on the original complaint would survive any amendment. Transcript of the Oral Argument held on January 26, 2007 ("Hrg. Tr.") 71, Docket Entry 211. The Second Circuit, however, has stated that "[i]t is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668-669 (2d Cir. 1977). After reconsidering its position in light of my Order dated February 9, 2007, plaintiff acknowledges that it must add the defaulting defaults to the proposed amended complaint if it wishes to pursue its claims against these defendants. Docket Entry 217.

§ 65-3.16(a)(12); *State Farm Mut. Auto. Ins. Co. v. Malella*, 4 N.Y.3d 313 (2005).

## DISCUSSION

A party may amend its pleading by leave of court, which "shall be freely given when justice so requires." FED. R. CIV. P. 15(a). *See also Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). Leave to amend may be properly denied only when there is evidence of "undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (*citing Foman*, 371 U.S. at 182, 83 S. Ct. at 230).

Defendants oppose amendment on three grounds: 1) prejudice from undue delay, 2) futility, and 3) prejudice from added complexity. Def. Mem.[7] First, defendants argue that plaintiff delayed in making its motion to amend until two-and-a-half years into the litigation and that this delay prejudices defendants. Second, defendants argue that the motion should be denied as futile in that a) the PAC fails to plead fraud with the specificity required pursuant to Federal Rule of Civil Procedure 9(b); b) the PAC fails to plead the RICO claims sufficiently; c) some of the proposed claims are barred under New York law; d) the RICO claims are barred by the McCarran-Ferguson Act; and e) and some of the proposed claims are barred on statute of limitations grounds and would not relate back to the original complaint. Lastly, defendants contend that adding seventy new defendants and twenty-six new claims would create a massive

---

[7] The Memorandum of Law in Opposition to Plaintiff's Motion for Leave to File First Amended Complaint ("Def. Mem.") was filed by defendants Jacob Kagan, Mariya Vitukhnovskaya, Mirka United, Inc., and Mara Services, Inc. Docket Entry 194. Additional defendants joined in the opposition. *See* Docket Entries 195, 198, 199. Sergei Khohklov, Rosgal Ltd., and Belford Instruments and Equipment, Inc., defendants named for the first time in the proposed amended complaint, filed their own opposition, arguing that their relationship to the defendants in the current complaint was too tenuous to justify being named in a massive RICO conspiracy. Docket Entry 201.

litigation that would be unnecessarily and unreasonably costly to litigate and unwieldy to manage.

## A.   *Prejudice from Undue Delay*

I find no undue delay by plaintiffs in seeking leave to amend two-and-a-half years after the original complaint was filed, and no significant prejudice to defendants as a result of the delay in light of the factual circumstances and procedural posture of the case. As the Second Circuit has stated, leave to amend should be denied based on undue delay "where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir. 1990), *quoted in Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000). None of these factors are present here.

Plaintiff has satisfactorily explained any delay, pointing out that a substantial amount of time was spent attempting to settle the case and that document discovery progressed slowly and with some difficulty. Hrg. Tr. 6, 9-10. *See also, e.g.*, Minute Entries dated Sept. 29, 2005 (settlement conference held) and Mar. 3, 2006 (same). Indeed, a review of the docket sheet reveals at least eight discovery motions brought by State Farm and at least a dozen discovery conferences. *See, e.g.*, Docket Entries 42, 46, 53, 81, 87, 92, 115, 155; Minute Entries dated Jan. 14, 2005, Apr. 5 and 28, 2005, May 25, 2005, June 27, 2005, Sept. 9 and 23, 2005, Jan. 26, 2006, Apr. 12, 2006, May 24, 2006, June 15, 2006, Aug. 11, 2006. Plaintiffs succeeded, at least in part, on all of these motions, resulting in court orders requiring defendants to answer plaintiff's discovery demands by dates certain. *See, e.g.*, Minute Entries dated Jan. 14, 2005, Apr. 5 and 28, 2005, May 25, 2005, June 27, 2005, Sept. 9, 2005, May 24, 2006. Thus, at least some of the

7

delay is the result of defendants' failure to comply in a timely manner with plaintiff's legitimate

discovery demands. Moreover, as a result of the delay in obtaining discovery, plaintiff only

recently learned much of the information necessary for its motion. Hrg Tr. 7-8; Pl. Mem. p. 3.

Even if plaintiff had been dilatory, that would not be a basis to deny its motion because

delay alone, absent prejudice, is insufficient to deny amendment. *Block v. First Blood Assoc.*,

988 F.2d 344, 350 (2d Cir. 1993); *Stone v. Courtyard Mgmt. Co.*, 2001 WL 395159, at *2

(S.D.N.Y. Apr. 17, 2001). Defendants here will not be prejudiced by the delay. "In determining

what constitutes 'prejudice,' [the Second Circuit] consider[s] whether the assertion of the new

claim would: (i) require the opponent to expend significant additional resources to conduct

discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii)

prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at

350, *quoted in Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000).

Defendants argue they would be prejudiced because of the additional discovery that will be

required and the ensuing delay in the final outcome of the proceedings if plaintiff is permitted to

file the PAC. Def. Mem. pp. 13-18. Although granting leave to amend will result in a

significant amount of additional discovery because of the number of new defendants, the current

procedural posture of this case suggests that granting leave at this juncture would be appropriate

and not unduly prejudicial. Discovery is still in the early stages. Indeed, only one of the original

defendants has been deposed; discovery thus far has focused mainly on documents. Pl. Mem. p.

9. Moreover, the court has not yet set any deadlines for completing discovery or moving for

summary judgment, and there is no trial date. Therefore, any delay that will result because of the

filing of an amended complaint will not require reconvening depositions that have already been

8

completed or adjusting any case management orders already in place.

Lastly, defendants have been aware of plaintiff's intention to move to file an amended complaint for at least a year prior to plaintiff's filing of the motion. The filing of an amended complaint was actually discussed in November of 2005 during a settlement conference. *See* Docket Entry 87. Defendants, at least those named in the current complaint, have also been on notice of the substance of plaintiff's proposed amendment since February 22, 2006, when State Farm filed a letter describing the PAC. Docket Entry 109. Plaintiff then filed its proposed amended complaint on October 6, 2006, Docket Entry 167, and filed its present motion seeking leave to amend on December 1, 2006.

The cases defendants rely on are easily distinguished from this one. In many of those cases, a finding of prejudice was based on discovery having either closed or being on the verge of closing. *See, e.g.*, *Grace*, 228 F.3d at 53 (affirming denial of leave because case was eleven years old, plaintiff knew the necessary information at least six years earlier, and depositions would have to be reopened); *Krumme v. Wespoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) (affirming denial because "case was near resolution and discovery had been completed"); *The Millgard Corp. v. E.E. Cruz*, 2002 WL 31812710, at *4-6 (S.D.N.Y. Dec. 12, 2002) (leave denied because three-and-a-half year delay in seeking amendment was not satisfactorily explained, depositions would have to be reopened, new expert discovery would have to be taken, and defendants who settled would be brought back into the litigation); *Stone*, 2001 WL 395159, at *2 (leave denied because plaintiff had already amended complaint three times, discovery was set to close one month before plaintiff made motion, and the pertinent facts were known to plaintiff long before she made her motion); *Suro v. U.S.*, 107 F. Supp. 2d 206, 210 (E.D.N.Y.

9

2000) (leave denied because the case was already five years old, discovery was almost closed, and plaintiff had notice of the proposed new defendant long before the motion was made); *Amaker v. Haponik*, 198 F.R.D. 386, 390 (S.D.N.Y. 2000) (leave denied because discovery was about to close and plaintiff sought to add unrelated claims); *Stricklin v. New York City Dep't of Corr.*, 1995 WL 447782, at \*2 (S.D.N.Y. July 28, 1995) (leave denied because discovery was set to close only three weeks after plaintiff made his motion, and because plaintiff failed to explain the two year delay in making the motion when the facts were known to plaintiff when he filed his prior pleadings); *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 112 F.R.D. 417, 419, 423 (S.D.N.Y. 1986) (leave denied because discovery was completed and defendants had already moved for summary judgment); *Commercial Agropequaria Menichetti Fuente S.A.C.I. v. Heather Trading*, 1986 WL 3780, at \*2-4 (S.D.N.Y. Mar. 27, 1986) (leave to add RICO claim denied because motion made one week before discovery set to close; leave granted to add other claims based on pertinent facts uncovered only recently during discovery).

Furthermore, courts have granted leave despite delays of more than two years where discovery was ongoing and other factors favored amendment. For example, in *American Medical Association v. United Healthcare Corporation*, 2006 WL 3833440, at \*4 (S.D.N.Y. Dec. 29, 2006), the court granted leave to file a third amended complaint to add claims under RICO and antitrust laws, despite a two-and-a-half year delay, because the delay was justified where the new complaint was based on evidence discovered only recently. *Id.* The court noted that the case was at an early stage procedurally and "nowhere near to being on the eve of trial." *Id.* Similarly, in *Fustok v. ContiCommodity Services, Inc.*, 103 F.R.D. 601, 603-04 (S.D.N.Y. 1984), the court granted leave to amend, "conclud[ing] that the delay or prejudice which the

10

proposed or existing defendants might suffer . . . is not 'undue' so as to warrant the motion's

denial." *Id*. at 604.  The court found that

> discovery appear[ed] to have already uncovered many of the facts
> relating to the prosecution of the added claims.  In addition, . . .
> discovery of the principle [sic] defense witnesses remain[ed] to be
> completed . . . . [And although] [t]he original complaint in this case
> was filed two and three-quarter years ago[,] . . . the delay that has
> resulted can be attributed to the magnitude of the case and the
> actions of both sides.

*Id*.

     As noted above, discovery is currently in the early stages and this case is "nowhere near

to being on the eve of trial." *Am. Med. Assoc.*, 2006 WL 3833440, at *4.  Additionally, I am

satisfied that the reason for any delay is due to "the magnitude of the case and the actions of both

sides," including time spent attempting to negotiate a settlement and litigating discovery motions.

*Fustok*, 103 F.R.D. at 604.  For all these reasons, I find there has been no undue delay by plaintiff

in moving to amend, and no substantial prejudice to defendants from the delay that has occurred.

**B.     Futility**

     As noted above, defendants raise five arguments as to futility: 1) fraud is not pled with

the requisite specificity; 2) the RICO claims are insufficiently pled; 3) various claims are barred

under New York state law; 4) the RICO claims are preempted by the McCarran-Ferguson Act;

and 5) and some of the proposed claims are barred on statute of limitations grounds.  Each of

these arguments is addressed in turn below.

     *1.     Specificity of fraud claims*

     Defendants argue that the PAC's Fourth and Fifty-Fifth Claims for common law fraud

fail to meet the specificity requirement of Rule 9(b).  Def. Mem. p. 19.  "In all averments of fraud

or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."
FED. R. CIV. P. 9(b).  To meet the requirements of 9(b), "the complaint must: (1) specify the
statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where
and when the statements were made, and (4) explain why the statements were fraudulent." *Mills*
*v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

    The PAC, read as a whole, describes the fraudulent conduct charged by plaintiff in great
detail.  With respect to the Fourth Claim, plaintiff alleges that the claims for reimbursement
submitted by Mara Services, Inc. ("Mara") and Mirka United, Inc. ("Mirka") are fraudulent for a
variety of reasons, as outlined in paragraph 27 of the PAC.  Among other things, plaintiff charges
that the claims for reimbursement submitted by the Retail Defendants overstated wholesale costs
and often reflected items that were not in fact provided.  PAC ¶ 27.  The Fourth claim identifies
some of the fraudulent invoices on which it is based, PAC ¶ 272 (*citing* PAC Exs. 39 and 40),
and the four individuals – Jacob Kagan, Margarita Khalavsky, Semen Vetukh and Mariya
Vitukhnovskaya – and two corporations – Mirka and Mara – alleged to have made the false
statements, i.e., to have created and submitted the fraudulent invoices to State Farm.  The PAC
makes clear that Kagan was the owner of Mirka, Vitukhnovskaya and Vitukh were the owners
and operators of Mara, and Khalavsky was the bookkeeper for Mara and Mirka.  PAC ¶¶ 65, 89,
176, 178, 179.  Plaintiff has identified the speakers, or creators of the false insurance claims,
identified the claims that it alleges are fraudulent and explained why it believes the claims are
fraudulent.  Thus, plaintiff has alleged sufficiently specific facts to satisfy Rule 9(b).

    The Fifty-Fifth Claim alleges fraud with respect to Jacob Kagan, his alleged Fraudulently
Incorporated PCs (Bergamo Medical, PC, Eshel Medical Rehabilitation, LLC, Meridian Medical

12

of NY, PC, Milan Medical, PC, and Refuah Medical Rehabiliation, LLC), the Paper Owner

Defendants of these PCs (Liliya Yanovskaya, German Laufer, and Zoya Maksumova), and Mara

and Mirka.  Again, the complaint is clear; plaintiff alleges that "each and every claim submitted

to State Farm by these [Fraudulently Incorporated PCs] was false and fraudulent" because the

clinics were fraudulently incorporated and therefore not entitled to reimbursement under New

York law.  PAC ¶ 578.  The details of the alleged fraudulent incorporation are spelled out as

well.  Plaintiff alleges that Jacob Kagan and other defendants, in violation of New York law,

caused certificates of incorporation for medical practices to be prepared indicating that licensed

physicians owned and operated the practices, when in fact the practices were owned and

controlled by Kagan and other defendants who are not doctors.  *Id.* ¶ 60.  Plaintiff has alleged

this aspect of the charged fraud with sufficient specificity to provide defendants with the notice

required by Rule 9(b).

Defendants' reliance on *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172-73 (2d Cir.

1990), and *Parnes v. Gateway 2000*, 122 F.3d 539, 550 (8th Cir. 1997), for the proposition that

"conclusory allegations fail to meet the requirements of Rule 9(b)" is misplaced.  Def. Mem. p.

20.  In *Parnes*, the court noted that the "allegation of fraud is simply not particularized.  Plaintiffs

fail to identify the goods and services allegedly purchased and sold by [defendant] at deflated and

inflated prices."  *Parnes*, 122 F.3d at 550.  Similarly, in *Wexner*, 902 F.2d at 172-73, the court

found that plaintiff's allegations failed to provide a factual basis from which an inference of

fraudulent intent could be drawn.  Here, in contrast, plaintiff has attached exhibits to its PAC that

particularize the fraud, i.e. the submission of allegedly fraudulent claims to State Farm, with

respect to each defendant.  *See* PAC Exs. 20-56.  For example, as against defendant Mara, the

13

attached exhibit provides the following information for each claim that State Farm alleges is

fraudulent: State Farm's claim number, the date of the mailing, the name of the wholesaler who

provided the Supplies, the specific Supplies involved in the claim, the wholesale price according

to the wholesale invoice, and the amount of State Farm's payment. *See* PAC Ex. 39.  These are

not conclusory allegations of fraud, but rather highly particularized itemizations of fraud.  Thus,

plaintiff has satisfied the requirements for 9(b) with respect to its common law fraud claims.

>   2.    *Specificity of RICO claims*

Defendants also argue that plaintiff has failed to plead its RICO claims with the requisite

specificity.  In particular, defendants assert that plaintiff has failed to allege with specificity how

certain defendants participated in the Mara-Mirka Enterprise. Def. Mem. p. 21.  Although

defendants argue that Rule 9(b) applies to claims of RICO violations, the case law is clear that

the higher 9(b) standard applies only to the allegations of fraud within a RICO claim.  *Hecht v.*

*Commerce Clearing House, Inc.*, 897 F.2d 21, 26 fn.4 (2d Cir. 1990) ("On its face, Rule 9(b)

applies only to fraud or mistake, not to conspiracy. Hecht's pleading of a conspiracy, apart from

the underlying acts of fraud, is properly measured under the more liberal pleading requirements

of Rule 8(a)."); *In re Sumitimo Copper Litig.*, 995 F. Supp. 451, 454-55 (S.D.N.Y. 1998)

("[A]llegations of the existence of a RICO enterprise must meet only the 'notice pleading'

requirements of Fed. R. Civ. Pro. 8.").  Nonetheless, where there are multiple defendants in a

RICO case based on fraud, each defendant's role in the fraudulent scheme must be specified.

*Zigman v. Giacobbe*, 944 F. Supp. 147, 153 (E.D.N.Y. 1996).

Defendants point to the Second Claim in particular as lacking the required specificity.  In

pleading a RICO violation, plaintiff must establish seven elements: "(1) that the defendant (2)

14

through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering

activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an

'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan*

*Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). The PAC pleads each of these elements; it alleges

that (1) Jacob Kagan, Margarita Khalavsky, Mariya Vitukhnovskaya and Semen Vitukh (2)

through the submission to State Farm of substantially more than two fraudulent claims, which (3)

constitute a pattern of (4) mail fraud, (5) own, operate, or significantly participate in (6) Mara

and Mirka, a RICO "association-in-fact 'enterprise,'" (7) whose activities include buying and

selling Supplies which affect interstate commerce. More specifically, plaintiff alleges that the

Mara-Mirka enterprise was created to submit fraudulent charges to State Farm for Supplies based

in part on prescriptions from Fraudulently Incorporated PCs that were secretly owned by Jacob

Kagan. PAC ¶ 27. Again, as noted above, the alleged roles of Kagan, Vitukhnovskaya,

Khalavsky, and Vitukh in the Mara-Mirka Enterprise are clearly stated. PAC ¶¶ 65, 89, 176, 178,

179. In addition, State Farm has provided charts, attached as Exhibits 39 and 40 to the PAC,

which detail a sample of the bills comprising the racketeering activity, mail fraud. As it does

with respect to the common law fraud claims, the PAC provides ample specificity regarding the

RICO claims.

Once again, the cases cited by defendants do not support their position. In *Wexner*, 902

F.2d at 172-73, the Second Circuit found a RICO pleading deficient because it failed to explain

the parameters of the alleged conspiracy to defraud or how defendant would have gained

anything from it. Here, State Farm alleges that Kagan, Vitukhnovskaya, Khalavsky, and Vitukh

profited financially from secret kickbacks from the wholesalers and by submitting inflated

invoices to State Farm. Unlike *Wexner*, plaintiff in this case has provided sufficient specificity

with respect to the parameters of the alleged RICO conspiracy and how each of the defendants

may have profited from the enterprise.

The decision in *AIU Insurance Company v. Olmecs Medical Supply, Inc.*, 2005 WL

3710370 (E.D.N.Y. Feb. 22, 2005) is particularly compelling support for plaintiff's position. In

*AIU Insurance Company*, plaintiff insurance companies brought suit against doctors, medical

supply retailers and medical supply wholesalers, alleging violations of RICO and common law

fraud based on a scheme to defraud insurance companies similar to the one alleged in the PAC.

Defendants in *AIU Insurance Company* argued that the complaint did not sufficiently describe

their participation in the charged enterprise. The court rejected the argument – apparently based

on allegations no more specific than those in the PAC – holding that

> [i]t is not always reasonable . . . to expect that when a defrauded
> plaintiff frames his complaint, he will have available sufficient
> factual information regarding the inner workings of a RICO
> enterprise to determine whether a defendant was merely
> "substantially involved" in the RICO enterprise or participated in
> the "operation or management" of the enterprise. Thus, where the
> role of the particular defendant in the RICO enterprise is unclear,
> plaintiffs may well be entitled to take discovery on this question.

*AIU Ins. Co.*, 2005 WL 3710370, at *8 (internal citation omitted). The complaint here provides

as much specificity, if not more, as did the complaint in *AIU Insurance Company*. Thus,

plaintiff's RICO claims are pled with sufficient specificity to satisfy the requirements of Rules

8(a) and 9(b). *See also Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.*, 2001 WL 282687, at *4

(S.D.N.Y. Mar. 22, 2001) (finding RICO claim sufficient where it alleged that defendants

"participated directly" in the conduct of the enterprise and that "nothing more is required" at the

16

pleading stage).

> 3.   *Claims Barred by New York State's "30-day Rule"*

New York's No-Fault Insurance laws require an insurer, such as plaintiff, to pay or deny a

verified claim for benefits within thirty calendar days of its submission (the "30-day Rule").[8]

N.Y. INS. LAW § 5106(a); N.Y. COMP. CODES RULES & REGS., tit. 11, § 65-3.8. If an insurer fails

to act on a claim within thirty days, any defenses to payment, including lack of medical necessity,

are waived. N.Y. COMP. CODES RULES & REGS., tit. 11, §65-3.8(c); *Presbyterian Hosp. v.

Maryland Cas. Co.*, 90 N.Y.2d 274, 285, 683 N.E.2d 1 (1997).  Defendants argue that plaintiff

waived its right to assert that they submitted claims for benefits that were not medically

necessary, or were otherwise fraudulent, because it paid those claims without raising any defense

to payment within the 30-day time period.  Def. Mem. pp. 21-23.

Numerous decisions from New York appellate courts explicitly hold that an insurer

waives any defense, including one of provider fraud, if it fails to follow the 30-day Rule. *See,

e.g., Valley Psychological, P.C. v. Liberty Mut. Ins. Co.*, 30 A.D. 718, 816 N.Y.S.2d 239 (3d

Dep't 2006); *Careplus Med. Supply Inc. v. State-Wide Ins. Co.*, 11 Misc. 3d 29, 31 (2d Dep't

2005) (holding that fraudulent billing is a form of 'provider fraud' subject to the 30-day Rule);

*Dilon Med. Supply Corp. v. State Farm Mut. Auto. Ins. Co.*, 2006 WL 3437826 (N.Y. App. Term

Nov. 17, 2006), at *1 ("While [an insurer] is not precluded from asserting a fraudulent scheme

involving a staged accident, i.e., 'a lack of coverage defense' . . ., [the insurer's] claim of fraud

---

[8] Although the time limit is called a "30-day Rule," an insurer may expand its time to act
on a claim beyond thirty days if it promptly seeks additional information to verify the claim's
legitimacy. *See* N.Y. INS. LAW § 5106(a); N.Y. COMP. CODES RULES & REGS., tit. 11, §§ 65-3.5,
65-3.8. Throughout this opinion, a reference to the 30-day Rule or 30-day period encompasses
any time beyond the thirty days available to an insurer under these verification regulations.

herein is premised upon an allegation of excessive billing or lack of medical necessity, and such

defense is subject to the 30-day preclusion rule."); *AT Med. P.C. v. Utica Mut. Ins. Co.*, 2006 WL

1131809 (N.Y. App. Term Apr. 14, 2006). Moreover, there is strong language from the New

York Court of Appeals stating that an insurer must act promptly and comply with the 30-day

Rule, even where it suspects fraud.[9] *Presbyterian Hosp.*, 90 N.Y.2d at 285 ("The tradeoff of the

no-fault reform still allows carriers to contest ill-founded, illegitimate and fraudulent claims, but

within a strict, short-leashed contestable period and process designed to avoid prejudice and red-

tape dilatory practices.").

   These cases, however, hold only that failure to assert fraud within the time required by

the 30-day Rule bars an insurer from raising a *defense* of fraud when later refusing to pay a

claim. New York statutes, regulations, and case law do not provide a clear answer where, as

here, an insurer that has paid a claim within the 30-day statutory time frame seeks to recover the

payment by prosecuting a case of fraud.[10] It appears that no appellate court in New York has

directly addressed the question presented here: whether making a payment within the 30-day

period without asserting a defense of fraud bars a subsequent affirmative claim to recoup the

---

[9] *See also* Informal Opinion of the New York State Ins. Dep't, Mar. 27, 2001, *available at http://www.ins.state.ny.us/ogco2001/rg103271.htm* (concluding that an insurer may deny a claim within thirty days "based upon a reasonable suspicion of fraud, . . . pending an investigation . . . . This would permit an insurer to delay payment while conducting the investigation and provide notice to the insured of a suspicion of fraud . . . .").

[10] The Second Circuit has noted that the 30-day Rule "raises a series of complex New York law questions," including whether an insurer "is time barred from bringing any damage claims because it did not raise [the question of fraud, or] request verification . . ., in accordance with the strict statutory and regulatory requirements for the challenging of claims. *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 509 fn. 9 (2004).

payment on grounds that it was fraudulently obtained.[11]

Courts in this district considering whether an insurer who has made a timely payment

may later bring an affirmative claim of fraud have come to different conclusions. *Compare*

*Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*, 475 F. Supp. 2d 213 (E.D.N.Y. 2007)

*with State Farm Mut. Auto. Ins. Co. v. Kalika*, 04-CV-4631 (E.D.N.Y. Mar. 16, 2006) (Report

and Recommendation, adopted, without objection, by United States District Judge Carol Bagley

Amon, Docket Entry 105); *State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401, 417,

421 fn.15 (E.D.N.Y. 2001). In *Allstate*, Senior United States District Judge Hurley concluded

that "[i]f no-fault insurers are precluded from raising fraudulent billing . . . as a defense to non-

payment absent a timely denial, then certainly such allegations cannot support an affirmative

claim absent a timely denial." 475 F. Supp. 2d at 227.[12]

---

[11] State Farm alleges that some of the claims in the PAC were paid or denied within thirty days while others were not. Pl.'s Letter dated Mar. 9, 2007, at 5, Docket Entry 223. Plaintiff thus acknowledges that it paid some of the claims late, or it was ordered to make a payment, by a court, arbitrator or some other administrative procedure, because of an untimely denial. *See, e.g., Dilon Med. Supply Corp v. State Farm Mut. Auto. Ins. Co.*, 2006 WL 3437826, at *1 (N.Y. App. Term Nov. 17, 2006) (remanding and ordering State Farm to pay interest and attorney's fees on claim because State Farm failed to assert the defense of billing fraud within the 30-day period); *Dilon Med. Supply Corp v. State Farm Mut. Auto. Ins. Co.*, 2006 WL 1892345, at *1 (N.Y. App. Term May 25, 2006) (same). On this motion, the only question is whether plaintiff's claims are futile, and I do not address the question of whether a failure to comply with the 30-day Rule and the related regulatory scheme is a bar to plaintiff's affirmative claims to recoup fraudulent benefits paid after the thirty days elapsed. At least one court, however, has suggested that an affirmative action to recoup benefits may lie even where an insurer paid untimely pursuant to a judgment in favor of a provider. *See, e.g., Fair Price Med. Supply Corp. v. Travelers Indem. Corp.*, 9 Misc. 3d 76, 803 N.Y.S.2d 337 (N.Y. App. Term 2005) ("We note in passing that an insurer precluded from defending a claim based on provider fraud is not without remedy; after paying such a claim, the insurer, for example, may have an action to recover benefits paid under a theory of fraud or unjust enrichment.").

[12] A motion for reconsideration of Judge Hurley's decision is currently pending. 05-CV-5934, Docket Entries 33-38.

I respectfully disagree.  Although the New York courts have made it clear that an insurer

is barred from raising an untimely *defense* of fraud, it does not follow that the courts would also

preclude an insurer who has timely paid a claim from subsequently asserting an affirmative claim

of fraud.  Two decisions of this court have suggested that an action to recoup payments induced

by fraud survives even though fraud was not asserted as a defense within the 30-day period.  In

*Mallela*, Senior United States District Judge Sifton noted, in dicta, his

> skepticism that an insurer is precluded [due to the 30-day Rule]
> from bringing an actionable fraud claim to recover benefits
> previously paid by its prior payment of the claims. . . .  That the
> court would preclude an insurer from raising most defenses,
> including most frauds, where the defense is not timely raised in
> order to ensure timely payment of claims does not imply that it
> would preclude an insurer from bringing suit at some later point,
> after the insured received his benefits on the basis of actionably
> fraudulent behavior.

175 F. Supp. 2d at 421 fn. 15.[13]  Similarly, in an unpublished decision, Magistrate Judge Pollak

concluded that

> [n]one of the[] cases [that preclude the defense of fraud for failure
> to follow the 30-day Rule] directly addresses the question
> presented when an insurer timely pays a claim only to discover
> later that the claim was fraudulent and that no monies were actually
> owed . . . .  Having considered the statutory language and the

---

[13] Judge Sifton, however, also noted that "New York courts are reticent to require the return of sums previously paid." *Mallela*, 175 F. Supp. 2d at 419.  On appeal, the Second Circuit certified to the New York Court of Appeals the following question: "Is a medical corporation that was fraudulent incorporated . . . entitled to be reimbursed by insurers, under [New York's No-Fault law] . . . for medical services rendered by medical practitioners?" 372 F.3d 500, 510 (2d Cir. 2004). On certification, the New York Court of Appeals answered the certified question in the negative, resting its holding on a regulation adopted by the Superintendent of Insurance on April 4, 2002. *Mallela*, 4 N.Y.3d at 322.  The Court of Appeals declined to consider whether an insurer "could recover money already paid out under theories of fraud or unjust enrichment" because the complaint did not make clear whether plaintiff had made any payments after the regulation's effective date. *Mallela*, 4 N.Y.3d at 322.

> policies behind the No-Fault law, this Court agrees with the
> interpretation of Section 5106 expressed not only by the [New
> York State Department of Insurance] but by [the court] in the
> *Progressive* case and by Judge Sifton in *Mallela*. . . . The policy of
> ensuring prompt payment . . . is not served by allowing fraudulent
> schemes to be perpetrated without recourse to the insurer seeking
> reimbursement for claims wrongly paid as a result of fraud and
> deceit . . . . [O]ften the nature of fraud is such that it is not easily
> discovered within that short period of time.

04-CV-4631, Docket Entry 100, at pp. 9-10.

The *Progressive* case cited by Judge Pollak appears to be the only New York lower court decision to have addressed the issue of the 30-day Rule in the context of an insurer bringing a suit to recover paid benefits based on a theory of fraud. *Progressive Ne. Ins. Co. v. Advanced Diagnostic and Treatment Med., P.C.*, 226 N.Y.L.J. at 18 (N.Y. Sup. Ct. Aug. 2, 2001). The court in *Progressive* concluded that the 30-day Rule was "clearly intended to provide for the prompt payment of covered No-Fault expenses due to a claimant. It would not appear to apply where, as here, the insurer has already paid those benefits and discovers fraud on the part of a health care provider, who has submitted fraudulent claims."[14] *Id.*

Equity suggests that those who commit fraud should not be able to retain fraudulent earnings. On the other hand,

---

[14] The court in *Progressive*, like Judge Pollak in *Kalika*, relied on a letter from the New York State Department of Insurance to plaintiff's counsel in *Progressive*, which indicated that the Department's interpretation of the 30-day Rule would not bar actions by an insurer seeking to recover benefits that were obtained through fraud. I do not give this informal opinion letter great weight, considering it was authored in response to a query from counsel for the insurers in the *Progressive Northeastern* case. *See also Malella*, 175 F. Supp. 2d at 418 fn.12. Moreover, the New York Court of Appeals has held that a question of "pure statutory reading and analysis, dependent only on . . . legislative intent," is a question for the courts and should not be abdicated to state regulatory agencies, such as the Department of Insurance, even where the agencies are authorized to promulgate regulations interpreting statutes. *In re Union Indemnity Ins. Co. of New York*, 92 N.Y.2d 107, 115 (1998).

> insurance companies have an obligation 'to investigate the facts
> upon which its liability to pay depends before making payment
> . . . . [T]here is nothing inequitable in requiring an insurance
> company to investigate before paying, at least where . . . it has
> notice of the need for investigation and there is then available to it
> all the evidence which it adduces as the basis of its action.'

*Mut. Benefit Life Ins. Co. v. Lindenman*, 911 F. Supp. 619, 629 (E.D.N.Y. 1995) (denying an

insurer's claim for reimbursement because the misrepresentations which were the basis for the

recoupment action were known to the insurer at the time that it paid the claim) (*quoting New*

*York Life Ins. Co. v. Guttenplan*, 30 N.Y.S.2d 430, 433 (N.Y. Cty. 1940)). Here, some of the

billing irregularities seem to be apparent on the face of the documents submitted by defendants to

State Farm. For example, as mentioned earlier, *see* footnote 5 *supra*, defendants submitted

invoices for Supplies that were ten to twenty times the usual wholesale price.

Nonetheless, barring insurers from bringing actions to recoup benefits obtained by fraud

would defy logic and public policy. Indeed, New York Insurance Law requires insurers to have

fraud detection plans that include "coordination with other units of an insurer for the

investigation and *initiation* of civil actions based upon information received by or through the

special investigation unit." N.Y. INS. LAW § 409 (c)(4). State Farm, at least in some instances

relevant here, complied with the provisions of New York's No-Fault law intended to encourage

prompt reimbursement of expenses incurred by accident victims. If an insurer could not later

bring an action for fraud, wrongdoers would have an incentive to flood insurers with bogus

claims and would be unjustly enriched when the insurers found themselves unable to uncover the

fraud within the 30-day period. As Justice Golia stressed in his dissenting opinion in *Fair Price*,

> To follow the majority's holding [which bars a defense of provider
> fraud for failure to follow the 30-day Rule] would be to invite a

22

> medical supplier to inundate an insurer with 'bogus' claims in
> hopes that the insurer will fail to deny one within the 30-day limit.
> Courts would then reward that scheme with a money judgment as
> against the insurer for upwards of 150% of the 'documented cost'
> of medical equipment that was never provided.  Most certainly an
> *absurdity* and most assuredly an *injustice*.

9 Misc. 3d at 82, 803 N.Y.S.2d at 342 (Golia, J., dissenting).  Precluding affirmative fraud claims

would undoubtedly result in the public paying higher premiums while individuals who engaged

in fraudulent, criminal activity reaped the rewards.  For all these reasons, I conclude that New

York's 30-day Rule does not bar plaintiff's claims.

   4.   *Preemption*

      Defendants next assert that plaintiff's RICO claims are futile because they are preempted

by state insurance laws.  Def. Mem. pp. 23-24.  Defendants rely for this argument on the

McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, which essentially provides that a state law

regulating insurance preempts any conflicting federal law.  However, in *Humana v. Forsyth*, 525

U.S. 299, 303, 119 S. Ct. 710, 714 (1999), the Supreme Court held, with respect to the Nevada

laws at issue in that case, that

> RICO c[ould] be applied . . . in harmony with the State's
> [insurance] regulation.  When federal law is applied in aid or
> enhancement of state regulation, and does not frustrate any
> declared state policy or disturb the State's administrative regime,
> the McCarran-Ferguson Act does not bar the federal action.

525 U.S. at 303, 119 S. Ct. at 714.  Moreover, in *Dornberger v. Metropolitan Life Insurance*

*Company*, 961 F. Supp. 506, 515-21 (S.D.N.Y. 1997), the court specifically found that RICO

claims are not preempted by New York State Insurance Laws under the McCarran-Ferguson Act.

Thus, the PAC's RICO claims are not preempted.

#### 5.    *Statute of Limitations*

With respect to all of the defendants, plaintiff has alleged fraudulent claims submitted

within the four-year limitations period for RICO or within the six-year period for common law

fraud. Plaintiff's Reply In Support of Motion for Leave to File First Amended Complaint,

Docket Entry 202, p. 20. Plaintiff concedes that some of the claims for payments identified in

the PAC may be outside the limitations period. Plaintiff, however, contends that it may still be

able to recover damages for these claims if a) the allegations in the PAC relate back to the

original complaint, b) equitable tolling applies, or c) plaintiff was not able to discover the injury

despite reasonable inquiry until a later date. *Id.* These are fact-sensitive questions and should

not be resolved against plaintiff at this stage of the proceedings. *See Lugosch v. Congel*, 2002

WL 1001003, at *1 (N.D.N.Y. May 14, 2002) (declining to consider defendants' proposed

evidence suggesting that claims were outside the statute of limitations and granting amendment

where claims, as alleged in the proposed amended complaint, were facially within limitations

period). Moreover, it is clear in any event that the claims against each defendant named in the

amended complaint are not barred in their entirety, even absent tolling or relation back, on statute

of limitations grounds. For all these reasons, defendants' limitations argument fails to

demonstrate that allowing the PAC to be filed would be futile.

### C.    *Prejudice from Complexity*

Defendants' most compelling argument is that amendment would create a massive,

complex litigation that would be difficult for this court and the parties to manage. I recognize the

validity of defendants' concerns that the litigation costs associated with defending a ninety-six-

defendant complaint will be substantial and that individuals with little connection to the main

24

conspiracy will be forced to participate in a large, multi-party lawsuit. Defendants' argument that leave should therefore be denied, however, is not supported by the case law.

At oral argument, I asked defendants to identify any case in which amendment was denied solely because the resulting lawsuit would have been too massive. Defendants cited three cases: *Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000); *Krumme v. Westpoint Stevens Inc.*, 143 F.3d 71 (2d Cir. 1998); and *Barrows v. Forest Labs., Inc.*, 742 F.2d 54 (2d Cir. 1984). Hrg Tr. 36. None of these cases, however, hold that leave should be denied because amendment would create a case too large and unwieldy to manage. *See Grace*, 228 F.3d at 53 (leave denied because case was more than eleven years old, plaintiffs had information necessary for motion several years earlier, and plaintiffs failed to explain delay); *Krumme*, 143 F.3d at 88 (leave denied because "case was near resolution and discovery had been completed"); *Barrows*, 742 F.2d at 56-58 (leave denied because motion was made two-and-a-half years after original complaint, amendment would significantly alter theories of relief, and substantial discovery was already complete).

Although granting leave to amend may complicate this litigation, that is not a basis for denying plaintiff's motion. This court is no stranger to multi-defendant, complex RICO actions. *See, e.g., Schwab v. Philip Morris et al.*, 04-CV-1945 (JBW); *AIU Ins.*, 2005 WL 3710370, 04-CV-2934 (ERK); *Cain et al. v. Bethea et al.*, 04-CV-3946 (JG); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs. PC et al.*, 04-CV-5045 (ILG); *U.S. v. Int'l Longshoremen's, AFL-CIO, et al.*, 05-CV-3212 (ILG). Several case management techniques are available in such cases to help lessen the parties' time, effort and expense and ensure that the litigation does not become unwieldy. For example, a centralized document depository system could ease the burden

25

imposed by voluminous document production. <u>Manual for Complex Litigation</u>, Fourth,
§ 11.444. Limits on the duration of depositions, restrictions on the number of depositions by
each party, or limits on who may attend and who may question the witness may be imposed.[15] *Id.*
§ 11.451. The parties could agree on other measures, such as conducting informal interviews or
telephonic or videoconferenced depositions. *Id.* § 11.452. Other mechanisms might include
restrictions on the number of interrogatories or stipulations of fact by the parties. *Id.* §§ 11.46,
11.471.

     Defendants also argue that a trial with ninety-six defendants and sixty-three separate
causes of action would be too cumbersome to manage. Here, too, the court may employ
techniques to ease the burden, including severance of issues or defendants for trial. Additionally,
the court may limit the number of attorneys who sit at counsel's table or assign primary
responsibility for aspects of the trial to a limited number of attorneys. *Id.* § 12.22. With these or
similar procedures in place, this litigation can proceed smoothly and efficiently for all parties. I
invite the parties to propose any additional mechanisms to ease any burden on the parties and the
court.

     Finally, as the proceedings to date demonstrate, the burdens of litigating this case
pursuant to the PAC may well be less overwhelming than they at first appear. For example,
some of the current defendants have already opted to pool their resources. Approximately eight
law firms are representing twenty-seven of the defendants. On the present motion, the

---

[15] For example, in another multi-defendant case pending before this Court, a Steering
Committee, composed of approximately four attorneys, plans and schedules complex discovery
and shares information with other counsel. *See Turkmen v. Ashcroft*, 02-CV-2307 (JG);
*Elmaghraby v. Ashcroft*, 04-CV-1809 (JG).

defendants joined together and filed only one opposition memorandum. It is therefore quite possible that many of the proposed new defendants may be represented by counsel already participating in the litigation or that some of them may similarly decide to pool their resources.

Although prudent case management may alleviate some of the burden and expense of defending the substantially expanded litigation contemplated by plaintiff, adding the new claims and parties identified in the PAC will pose significant challenges. Keeping in mind that leave to amend may properly be denied when a proposed amendment would unduly prejudice the non-movant, *Milanese*, 244 F.3d at 110, I now weigh the burden adding the new claims and parties identified in the PAC will impose against the degree to which their joinder will promote fairness, efficiency and economy. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 1138 (1966) (concluding that the Federal Rules of Civil Procedure "strongly encourage[]" joinder of claims and parties to "entertain[] the broadest possible scope of action consistent with fairness to the parties"); *Fair Hous. Dev. Fund Corp. v. Burke*, 55 F.R.D. 414, 422-23 (E.D.N.Y. 1972) (pointing out that "[t]he purpose of [Rule 20] is to promote trial convenience and to expedite the final determination of disputes," and denying leave to amend to add a new party where joinder would "complicate and further delay" the lawsuit).

Pursuant to Federal Rule of Civil Procedure 20(a), "[a]ll persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Thus, in considering whether joinder of new defendants is appropriate, I examine whether plaintiff will rely on the same evidence – such as invoices and claims for benefits it

27

contends are fraudulent – to prove its claims against the proposed new defendants as it will to prosecute its case against the current defendants.  I focus on overlapping proof because joining claims depending on the same evidence in one proceeding will promote judicial economy and the likelihood of consistent verdicts.

Joinder of the proposed new Wholesale Defendants is warranted.  Some of the current Retail Defendants used invoices from these wholesalers in their submissions to plaintiffs, and proving the claims against the new Wholesale Defendants will thus require the same evidence, i.e., the same invoices, as will be used against existing Retail Defendants.  For example, in the existing complaint, plaintiff alleges that Mara, a retailer, submitted fraudulent invoices to State Farm.  Compl. ¶ 284; Pl.'s Letter dated Feb. 7, 2007, Ex. A ("Pl.'s Chart") (chart prepared by State Farm demonstrating the connections among the current and proposed defendants), Docket Entry 212.  Through discovery, plaintiff learned that the invoices were supplied not only by three wholesalers named in the original complaint – Grafman Quality Products, Inc., Health World AI Ltd., and Unique Distributor Inc. ("Unique") – but also by Star Diagnostic Center, Inc., d/b/a Star Medical Systems ("Star"), a proposed new Wholesale Defendant.  *See* PAC Ex. 39; Pl.'s Chart. Thus, plaintiff's case at trial against Mara would necessarily include introduction of the Star invoices.  If leave to amend were denied, plaintiff would be required to present identical proof that the Star invoices submitted to State Farm by Mara were fraudulent in two cases.  Plaintiff should not be put to the burden of prosecuting two separate cases with identical factual predicates.  Similarly, Rosgal, Ltd, a proposed Wholesale Defendant, provided invoices to Madera Medical Supply, Inc. and Northridge Supply, Inc., Retail Defendants in the original complaint.  *See* Pl's Chart.  Finally, Atlas Medical Equipment ("Atlas") is owned, according to

28

plaintiff, by the same individual who owns Star, and thus joinder of Atlas is appropriate.[16]

The same logic compels inclusion of the putative Retail Defendants. Although they may not have a direct connection to the existing complaint, they are sufficiently connected to the new parties named in the PAC to warrant their joinder. More specifically, these Retail Defendants obtained invoices they submitted to plaintiff from the Wholesale Defendants named in the PAC. For example, if Star is added as a Wholesale Defendant, it follows that retailers who relied on invoices from Star, such as Amaze Medical Supply, Inc., Careplus Medical Supply, Inc., and Edel Surgical and Medical Supply, Inc., are appropriately joined in the PAC because plaintiff's case against Star will include invoices submitted by these retailers. PAC Ex. 55; Pl's Chart. Under these circumstances, the efficiencies of joinder warrant granting leave to join the Retail Defendants in the PAC. The alternative would be to require Star to defend itself in multiple litigations alleging the same fraud and based on the same invoices. The same connection to at least one Wholesale Defendant applies to each of the newly named Retail Defendants (with the exception discussed below). *See* Pl.'s Chart.

Several of the proposed new defendants are connected only to entities that defaulted on the original complaint. Plaintiff intends to serve the defendants who defaulted with the PAC, *see* Docket Entry 217, and they may or may not appear. Whether or not they appear, it is reasonable to expect that evidence that they submitted inflated invoices will be introduced either at a trial, or at a damages inquest if they again default. Thus, I conclude that there is a sufficient connection to the original complaint to include the new defendants whose connection is to

_____

[16] One proposed Wholesale Defendant – Macro Med Wholesale Product, Inc. – should not be joined, as discussed below.

defendants that originally defaulted.[17]

The inclusion of the Fraudulently Incorporated PCs and the Paper Owner Defendants

(collectively, the "Clinic Defendants") in the PAC is also appropriate, although the connection is

different and slightly more attenuated. Plaintiff alleges that Jacob Kagan, a current defendant, is

the true owner of five of the proposed new clinics. Pl.'s Chart. Similarly, State Farm alleges that

Margarita and Robert Khalavsky, current defendants, are owners of Palermo Medical, PC. *Id.*

Three of the proposed Clinic Defendants are owned by Eduard Koretsky, who is a new

defendant, but who is alleged to own AAA-RAA Medical Supply, Inc., a Retail Defendant in the

original complaint. Moreover, some of the claims submitted for reimbursement by the Retail

Defendants to plaintiff were for Supplies prescribed by the Clinic Defendants. PAC ¶ 27(c).

Thus, the question of whether the Clinic Defendants were fraudulently incorporated directly

impacts the liability of the Retail and Wholesale Defendants with respect to those claims for

Supplies that State Farm alleges were not medically necessary because they were prescribed by

the Clinic Defendants. These connections are sufficient to warrant inclusion of the Clinic

---

[17] The defendants whose connection to the PAC rests on defendants that have defaulted
are Dmitriy Kazakov, Dilon Medical Supply, Corp., Lyubov Groysman, Fair Price Medical
Supply, Corp., Bohdar Vasechko, Model Supply, Inc., Igor Kats, Vista Surgical Supplies, Inc.,
Rubin Kaykov, Triangle Management Corp., Triangle R, Inc., and Luster, Inc. Similarly,
plaintiff alleges that Artur Klotsman, Yacov Moin, and Demitry Tsepenyuk own A to Z Medical
Supplies, Inc., AYD Services, Inc., KLM Trading, Ltd., and YAD Trading & Services, Inc.
Their participation in the alleged conspiracy is limited to having presented invoices received
from some of the Wholesale Defendants who defaulted on the original complaint, writing checks
to third parties who used putative Check Cashing Defendants, and using consulting services
provided by Jacob Kagan. PAC ¶¶ 24-25, 66-67. If the same Wholesale Defendants default
again and the only connection to the amended complaint for these defendants remains through
the defaulting parties, these new defendants may move to sever their claims, if they believe the
interests of efficiency and economy so warrant.

Defendants in the PAC.[18]

The joinder of the Check Cashing Defendants, however, is more troubling. State Farm alleges that the Check Cashing Defendants assisted in the scheme by cashing checks without filing reports required by law, or by filing reports that did not accurately identify the customers conducting the transactions being reported. PAC ¶¶ 28-58. These allegations are only tangentially relevant to the fraudulent scheme at the heart of the PAC, and establishing them would likely involve different proof. Plaintiff's case against the Wholesale and Retail Defendants will almost certainly focus on the fraudulent nature of the invoices provided by the wholesalers and claim forms submitted by the retailers. PAC ¶ 27. In contrast, the case against the Check Cashing Defendants will likely center around their failure to file currency transaction reports required by law. *See, e.g.,* PAC Exs. 2-6 (criminal charges against check cashers for failing to comply with federal reporting requirements). Proof that the invoices submitted to plaintiff were inflated is largely irrelevant to the liability of the Check Cashing Defendants. Although proof that checks issued by Retail Defendants were cashed to generate liquid funds for kickbacks may be part of plaintiff's case, whether the check cashers filed the reports required by law is likely to have little, if any, bearing on the liability of the Retail and Wholesale Defendants. Thus, the Check Cashing Defendants are at least one step removed from the alleged fraud against State Farm. Unlike the Retail, Wholesale and Clinic Defendants, the Check Cashing Defendants

---

[18] It seems likely that evidence about the Fraudulently Incorporated PCs would be offered even at a trial against only the Wholesale and Retail Defendants. If the individuals who own the wholesale and retail corporations deny that they acted with fraudulent intent when they submitted invoices for Supplies to State Farm, plaintiff may offer evidence concerning their fraudulent incorporation of medical clinics. *See* FED. R. EVID. 404(b) ("other act" evidence admissible to prove motive, intent, knowledge, and absence of mistake or accident).

did not submit any invoices or claims directly to State Farm or create any documents that were submitted to State Farm by others.

Moreover, plaintiff's allegations against the Check Cashing Defendants fail to allege participation in a RICO conspiracy sufficiently. As discussed above, in pleading a RICO violation, plaintiff must establish seven elements, including demonstrating that a defendant "directly or indirectly invests in, or maintains an interest in, or participates in . . . an 'enterprise.'" *Moss*, 719 F.2d at 17. Although plaintiff alleges that the Check Cashing Defendants were aware that the checks were part of a health care fraud scheme, this is insufficient to support even an inference that these defendants "participated" in a RICO conspiracy. *See also* Hrg. Tr. 21 (recognizing that plaintiff will likely face a "proximate cause" argument from the Check Cashing Defendants that mere knowledge of the fraudulent scheme, combined with cashing checks presented by the Wholesale Defendants, is insufficient to establish RICO liability against the Check Cashing Defendants).

Further, plaintiff has failed to establish how the Check Cashing Defendants profited from any involvement in the alleged RICO conspiracy. *See Wexner*, 902 F.2d at 172-73 (dismissing RICO complaint for failing to plead with sufficient specificity how the defendant profited from the alleged fraud). Plaintiff alleges that the Check Cashing Defendants deducted fees from the fraudulent checks. *See, e.g.*, PAC Ex. 9 ¶ 35 (Affidavit of a retailer describing the alleged conspiracy which states that the check cashers received 1 ½ to 3% for cashing checks). Plaintiff, however, does not allege that a 1 ½ to 3% fee is greater than the fee a check casher would deduct in the ordinary course of its business for legitimate transactions. These allegations against the Check Cashing Defendants do not provide a factual basis to support a reasonable inference that

32

they participated in a RICO conspiracy to defraud State Farm.

Additionally, I am particularly reluctant to permit joinder of the Check Cashing Defendants because plaintiff apparently seeks to offer proof that at least some of these defendants have criminal records. *See* PAC ¶¶ 38-48; FED. R. EVID. 609. This evidence of criminality could be highly prejudicial to the other defendants.

Lastly, plaintiff's proffer of proof against the Check Cashing Defendants does not support joinder. *See* PAC Exs. 6-8, 10, 13. For example, Exhibit 8 of the PAC is a chart detailing checks supposedly cashed by Bargain Island, a Check Cashing Defendant, in furtherance of the alleged fraud. According to the chart, A to Z Medical Supplies, Inc. ("A to Z"), a new retail defendant, wrote a series of checks in 2002 to Oceanview Wholesale Management Inc., Parkway Wholesale, Reliable Consulting, and Langhorne Wholesale Ltd., all non-parties, who apparently cashed checks at Bargain Island. None of these checks would be part of State Farm's case against A to Z because the liability of A to Z depends on invoices, and perhaps corresponding checks, from Unique and Seaside Wholesale, Ltd., the Wholesale Defendants from whom A to Z purchased Supplies and obtained inflated invoices. In fact, only a small portion of the checks that plaintiff cites as cashed by the Check Cashing Defendants involve checks written and received by Retail and Wholesale Defendants. *See* PAC Ex. 6 (approximately only eight of the two hundred forty checks cited in the exhibit were issued by Retail Defendants to a Wholesale Defendant); Ex. 7 (approximately ten of the one hundred seventy-seven checks were issued by Retail Defendants to a Wholesale Defendant); Ex. 10 (approximately only twenty-one of the almost fifteen hundred checks were issued by Retail Defendants to Wholesale Defendants); Ex. 13 (less than twenty of the checks connect the Retail, Wholesale, and Check Cashing Defendants

together). Accordingly, I am denying plaintiff's motion to amend with respect to the addition of the Check Cashing Defendants.

Finally, there are four defendants named in the PAC who were not named in the original complaint, and whose connection to the current and proposed amended complaints remains too tenuous to warrant joinder. The only connection to the current complaint for Michael Zavrazhin and his corporation Macro Med Wholesale Product, Inc. ("Macro Med") is that, at an unspecified time, Zavrazhin resided in a building at which another putative defendant was an owner of a business. PAC ¶ 154; *see also* PAC ¶¶ 564-75. Although the PAC states that Retail Defendants submitted fraudulent charges based upon wholesale invoices from Macro Med, PAC ¶ 138, the corresponding exhibits do not include any invoices from Macro Med or any claims from Retail Defendants based on invoices from Macro Med. *See* PAC Exs. 16-18, 27, 32, 33, 35, 38-40, 42. Additionally, the only connection to the complaint for Iosif Valdman and his corporation V&B Magic Recovery Supply is through Zavrazhin and Macro Med. *Id.* ¶ 227. Accordingly, the proposed amended complaint should delete all claims against Zavrazhin, Macro Med, Iosif Valdman, and V&B Magic Recovery Supply.

34

## CONCLUSION

For all these reasons, plaintiff's motion for leave to file an amended complaint is granted, except that the motion is denied with respect to the Check Cashing Defendants and defendants Michael Zavrazhin, Macro Med Wholesale Product Inc., Iosif Valdman, and V&B Magic Recovery Supply.  Plaintiff may file an amended complaint in accordance with this Order no later than June 4, 2007.

**So Ordered.**

_____/s/_____

**Steven M. Gold**
**United States Magistrate Judge**

**May 22, 2007**
**Brooklyn, New York**

*U:\eoc 2007\state farm\m&o final.wpd*

35