UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE
    INSURANCE COMPANY,

                    Plaintiff,

-against-

ACCURATE MEDICAL, P.C.,
J P MEDICAL, P.C.,
QUALITY MEDICAL HEALTH CARE
    PROVIDER, P.C.,
JADAWIGA PAWLOWSKI, M.D.,
DAVID M. BURKE, M.D., and
HISHAM ELZANATY,

              Defendants.
-------------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★   JAN 05 2007   ★
BROOKLYN OFFICE

07-CV- **07** ( ) **51**

**COMPLAINT**

**JURY TRIAL DEMANDED**

VITALIANO, J.

      State Farm Mutual Automobile Insurance Company ("State Farm"), for its complaint against defendants, alleges as follows:

## I.    NATURE OF THE ACTION

      1.     State Farm is entitled to recover money fraudulently obtained from State Farm through the submission of hundreds of bills for neurological consultations ("Consultations") and diagnostic tests ("the Tests") purportedly rendered for diagnostic purposes to individuals ("Insureds") who are involved in automobile accidents and are eligible for no-fault insurance benefits under State Farm's policies. At all times relevant, the defendants have known that (a) the Consultations and Tests were performed pursuant to a fraudulent, pre-determined protocol designed to maximize the charges to State Farm and other insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who have been subjected to them, (b) the Consultations invariably result in the performance of

the Tests, regardless of any Insured's unique circumstances and the fact that they are medically unnecessary, (c) the nature and number of Tests performed on all Insureds are virtually always the same, and are not related to any Insured's unique circumstances, (d) the billing code used to bill State Farm for the Consultations—99245—materially misrepresents and exaggerates the level of services provided which results in inflated charges, and (e) Accurate Medical, P.C., J P Medical, P.C. and Quality Medical Health Care Provider, P.C. (hereinafter these three professional service corporations are collectively referred to as "the Fraudulently Incorporated PCs") were fraudulently incorporated by falsely representing to the New York Department of Education ("the DOE") and Department of State ("the DOS") that Jadawiga Pawlowski, M.D. owned, controlled and practiced through them when, in fact, they were secretly owned and controlled by Hisham Elzanaty and were never eligible for the payments that State Farm seeks to recover in this action.

2.     State Farm also is entitled to a declaratory judgment that the Fraudulently Incorporated PCs have no right to receive payment for any pending bills for any professional services, including the Consultations and Tests.

3.     The defendants' scheme began as early as 1998 and has continued uninterrupted since that time.  As a result of the defendants' scheme, State Farm has incurred damages of more than $1,750,000.

## II.     ALLEGATIONS COMMON TO ALL COUNTS

### A.     Claims For Payment Under The No-Fault Laws

4.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R.

2

§ 65, *et seq.*) (collectively "the No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

5. No-Fault Benefits include up to $50,000 per Insured for necessary expenses incurred for various health care goods and services, including medically necessary consultations and diagnostic tests.

6. Insureds can assign their right to No-Fault Benefits to providers of medically necessary consultations and diagnostic tests. Pursuant to such assignments, providers may submit claims directly to insurance companies and receive No-Fault Benefits for these services.

7. Fraudulently incorporated providers of professional services are not eligible to collect No-Fault Benefits.

**B.** **The Roles Of The Defendants In The Scheme**

        **1.** **Dr. Pawlowski, The Fraudulently Incorporated PCs and Their True Owner Hisham Elzanaty**

8. The New York legislature has established a comprehensive statutory framework, including the Business Corporation, Education, Penal and Public Health Laws, to ensure that professional health care services are rendered only by individuals who are duly licensed to practice those professions and that such individuals are employed only by entities that are themselves licensed or otherwise legally authorized to provide such services. This legal framework bars individuals, such as Hisham Elzanaty, who are not subject to state licensing requirements and ongoing regulatory oversight from controlling, exercising undue influence over or deriving economic benefit from the practice of a profession. Recognizing the fundamental importance of these laws in safeguarding the public health, safety and welfare, the New York legislature has made it a felony offense for anyone to deliberately circumvent these laws, as well as an act of professional misconduct for any licensed individual or professional service

3

corporation to do so. *See* Business Corporation Law § 1503(b), 1507, 1508, 1511, Education Law § 6507(4)(c), 6512, §§ 6530(1) and (21) and Penal Law § 175.10.

9.      To deliberately circumvent these laws and fraudulently induce the DOE to issue a certificate of authority authorizing the Fraudulently Incorporated PCs to be formed and to practice medicine, Hisham Elzanaty paid Jadawiga Pawlowski to falsely represent in certificates of incorporation filed with the DOE and DOS that she was the true shareholder, director and officer of the Fraudulently Incorporated PCs and that she truly owned, controlled and practiced through them.  In fact, Dr. Pawlowski has never been the true shareholder, director and officer of the Fraudulently Incorporated PCs, nor has she ever really owned or controlled them.  True ownership and control of the Fraudulently Incorporated PCs has always rested entirely with Hisham Elzanaty who has used the facade of the Fraudulently Incorporated PCs to do indirectly what he is forbidden from doing directly, namely employing physicians (like Drs. Pawlowski and Burke) and other licensed health care professionals, controlling their practices, and charging for and deriving an economic benefit from their services.

10.     The arrangement between Dr. Pawlowski, Hisham Elzanaty and the Fraudulently Incorporated PCs has several hallmarks of a classic doc-in-the-box scheme.  First, the addresses of the Fraudulently Incorporated PCs—4470 Broadway, New York, New York and 930 E. Tremont Avenue, Bronx, New York—are the business offices of Hisham Elzanaty and an attorney who pursues the collection of No-Fault Benefits for the Fraudulently Incorporated PCs. Second, Hisham Elzanaty has total control over the deposits into and withdrawals from the bank accounts for the Fraudulently Incorporated PCs.  Third, virtually all deposits to the bank accounts of the Fraudulently Incorporated PCs are funneled to Hisham Elzanaty, rather than to their purported owner Dr. Pawlowski.  From January 2004 to January 2006, for example,

4

approximately $5,300,000 which equaled about 90% of the revenues that were deposited into the bank accounts of Accurate Medical, P.C. and J P Medical, P.C. were funneled to Hisham Elzanaty. Fourth, Dr. Pawlowski had little or no involvement in any Consultations or Tests provided by the Fraudulently Incorporated PCs. Moreover, Dr. Ahmed Elfiky who purportedly performed many of the Consultations for Accurate Medical, P.C. testified in a September 9, 2005 examination under oath that he had met and spoke to Dr. Pawlowski only once which was when he answered an ad in the New York Times and interviewed for the job. Finally, one of the Fraudulently Incorporated PCs—Quality Medical Health Care Provider, PC—was formed in April 2005 which was shortly after State Farm requested Dr. Pawlowski's examination under oath in connection with claims submitted to State Farm by Accurate Medical, P.C. and J P Medical, P.C. This is a common "shell game" used by participants in doc-in-the-box arrangements—to create new entities with new names and new tax identification numbers (like Quality Medical) to continue submitting fraudulent charges to insurers for the same medically unnecessary services provided by the same individuals in the same locations, after insurers begin questioning the claims of other entities with other tax identification numbers (like Accurate Medical and J P Medical) which are controlled by the same people (like Elzanaty).

11. Consistent with the public policies underlying New York's ban on the corporate practice of medicine, the No-Fault Laws prohibit fraudulently incorporated PCs which are secretly owned and controlled by laypersons such as Hisham Elzanaty from receiving No-Fault benefits for professional health services. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12). Accordingly, the Fraudulently Incorporated PCs have never had any right to receive No-Fault Benefits for any professional health services, including the Consultations and Tests.

12.     The Fraudulently Incorporated PCs have referral arrangements with several clinics ("the Clinics") in the New York City area.  The Clinics cater to high volumes of fully ambulatory Insureds who uniformly receive a laundry list of professional services at the Clinics from a battery of healthcare providers, including the Consultations and Tests from medical doctors who are employed by or contract with the Fraudulently Incorporated PCs.

13.     The Fraudulently Incorporated PCs and other healthcare providers who purport to render the laundry list of services to patients at the Clinics typically have financial kickback arrangements with the Clinics.  The kickbacks are typically disguised as ostensibly legitimate fees to "lease" space or personnel from the Clinics, or for "management" or billing and collection" services provided by the Clinics.  In fact, these are nothing more than "pay to play" arrangements in which all providers of healthcare goods and services at the Clinics, including the Fraudulently Incorporated PCs, are required to pay kickbacks if they want to render and charge for services to Insureds at the Clinics

14.     Pursuant to a pre-determined fraudulent protocol at the Clinics, chiropractors at the Clinics routinely refer the Insureds for neurological Consultations and, in some instances, recommend that some or all the Tests be considered or performed even though such Tests are duplicative of Tests that have already been performed on the Insureds by other doctors and cannot accomplish the diagnostic purposes for which they are purportedly recommended by the chiropractors.

15.     The medical doctors who perform the neurological Consultations are employed by or contract with the Fraudulently Incorporated PCs, and include Ahmed Elfiky and Syed Jalal. As a result of the Consultations, these medical doctors typically diagnose the Insureds with muscle sprains/strains and often recommend either considering or performing various

6

neurological diagnostic tests. Accurate Medical P.C. and Quality Medical Health Care Provider P.C. then submit fraudulent charges to State Farm for each such Consultation. These charges are fraudulent in that they are always billed under the same billing code—99245. According to the fee schedule applicable to claims for No-Fault Benefits, billing code 99245 typically represents that the doctor spent 80 minutes face-to-face with the patient and/or family to address a presenting problem of moderate to high severity, and the maximum permissible charge for this service is $230. The use of billing code 99245 in every instance materially misrepresents and exaggerates the level of services provided by the medical doctors performing the Consultations, and has been used solely to inflate the charges to $230 for each such Consultation. In fact, in many instances, both Accurate Medical P.C. and Quality Medical Health Care P.C. have each submitted a separate charge of $230 under billing code 99245 for an initial consultation on the same patient on or about the same date. Even if an initial consultation were necessary in the first instance, there was no need for two identical initial consultations on or about the same dates.

16.     Regardless of the findings and recommendations of the medical doctors who perform the Consultations, Dr. David Burke purports to perform and interpret the same Tests for virtually every Insured, namely nerve conduction velocities ("NCVs"), as well as somatosensory evoked potentials ("SEPs") and Brainstem Evoked Potentials ("BEPs"). Remarkably, in most instances, he does not perform the Tests that the medical doctors who performed the Consultations have recommended. Specifically, (1) BEPs and SEPs are routinely performed, but seldom recommended as a result of the Consultations, and (2) NCVs are routinely performed, but are never done in conjunction with needle electromyography tests ("EMGs"), despite the fact that in every instance where NCVs are recommended as a result of the Consultations the recommendation always includes that they be performed together with needle EMGs; performing

7

the needle EMGs with the NCVs is essential to accomplish the diagnostic purpose for which these Tests are purportedly performed, namely to diagnose radiculopathies (i.e. pinched nerve roots).

17.     The Fraudulently Incorporated PCs submit charges for the Tests which are fraudulent in that the defendants know that (a) the Tests that Dr. Burke purports to perform and interpret are not medically necessary and cannot accomplish the diagnostic purposes for which they purportedly are performed, (b) regardless of the findings and recommendations from the Consultations, Dr. Burke invariably performs and interprets the medically unnecessary Tests on virtually every Insured, (c) the nature and number of Tests that Dr. Burke performs and interprets on virtually every Insured are not tailored to any Insured's unique circumstances, and (d) the nature and number of Tests that Dr. Burke performs are designed solely to maximize the profits, rather than to benefit the diagnosis or treatment of any Insured.

### C.     The Medically Unnecessary Tests And Fraudulent Charges

18.     NCVs, SEPs and BEPs are all forms of electrodiagnostic tests, and are purportedly performed and interpreted by Dr. Burke because they are medically necessary to diagnose whether the Insureds have radiculopathies or, in the case of BEPs, neurological conditions affecting the brainstem.

19.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which  consists of thousands of neurologists and physiatrists and is dedicated solely to the scientifically based advancement of neuromuscular medicine, has adopted a Recommended Policy ("Recommended Policy") regarding the optimal use of electrodiagnostic medicine to diagnose various forms of neuropathies, including radiculopathies.  A copy of the Recommended Policy is attached hereto as Exhibit A.  The Recommended Policy accurately

8

reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

20. As explained below, Dr. Burke's pre-determined package of Tests stands in marked contrast to the Recommended Policy in at least four respects (a) the Recommended Policy recognizes that NCVs must be performed in conjunction with needle EMGs to have any usefulness in diagnosing radiculopathies, but Dr. Burke never performs EMGs in conjunction with any of the NCVs which he purportedly renders to diagnose radiculopathies, (b) the Recommended Policy recognizes that the maximum number of NCVs and needle EMGs which should be necessary to diagnose a radiculopathy in 90% of all patients is NCVs of 3 motor nerves and 2 sensory nerves, with EMGs of 2 limbs, but Dr. Burke performs NCVs of 8 motor nerves and 8 sensory nerves on virtually every Insured, with no needle EMGs, (c) the Recommended Policy does not identify SEPs as having any documented usefulness for diagnosing radiculopathies, but this is the purported purpose for which Dr. Burke performs and interprets the SEPs on all Insureds, (d) the Recommended Policy explains that the decision of which, if any, of these Tests to perform should be individually tailored to address the unique circumstances of each patient, but Dr. Burke's pre-determined package of Tests is not tailored to the unique circumstances of any Insured; instead, virtually every Insured receives the same Tests on the same nerves, and (e) the Recommended Policy recognizes the importance that the physician who is responsible for the performance and interpretation of the Tests be present or immediately available when the Tests are designed and performed, but the Tests were performed by technicians and Dr. Burke was seldom, if ever, present when any of the Tests were performed. See Ex. A.

9

1.     **NCVs**

21.     NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The velocity, amplitude and shape of the response are then recorded by electrodes attached to the surface of the skin, and are compared with well defined normal responses to identify the existence, nature, extent and specific location of any abnormalities in the sensory and motor nerve fibers of peripheral nerves in the arms and legs.

22.     The purpose for which Dr. Burke purportedly performs the NCVs is to diagnose radiculopathies. With limited exceptions that are not applicable here, the one electrodiagnostic test that is necessary to confirm or exclude the existence of a radiculopathy is a needle EMG which involves the insertion of a needle in various muscles to measure electrical activity in each such muscle. In fact, in a September 9, 2005 examination under oath, Dr. Elfiky (who performed many of the Consultations at issue) testified that NCVs must be done together with EMGs to diagnose radiculopathies. Yet, Dr. Burke never performed a needle EMG on any of the Insureds, thereby rendering it impossible for the NCVs that he did perform to have any value in accomplishing the diagnostic purpose for which the NCVs purportedly were performed. See Ex. A. Moreover, in many instances, many of the Insureds who were subjected to NCVs from Dr. Burke also received NCVs with needle EMGs from other doctors who had no apparent relationship with or connection to Dr. Burke. Although this overlapping testing often occurred at about the same time, the reports of these other doctors inexplicably make no reference to the NCVs performed by Dr. Burke and Dr. Burke's reports make no reference to the NCVs and needle EMGs performed by the other doctors.

23.     Furthermore, there are several peripheral nerves in the arms and legs which can be tested with NCVs. Many of these peripheral nerves have both sensory and motor nerve fibers,

10

either or both of which can be tested with NCVs.  The decision of which peripheral nerves to test

in each limb and whether to test the sensory fibers, motor fibers or both motor and sensory fibers

in any such peripheral nerve should be tailored to each patient's unique circumstances.  In a

legitimate clinical setting, this decision is determined based upon a history and physical

examination of the individual patient as well as the real-time results obtained as the NCVs are

performed on particular peripheral nerves and their sensory and/or motor fibers.  As a result, the

nature and number of the peripheral nerves and the types of nerve fibers tested with NCVs

should vary by patient.  See Ex. A.

24.    Fraudulent charges by defendants for the Consultations and Tests are described, in

part, in Exhibit B attached hereto.  As set forth in Exhibit B, Dr. Burke does not tailor the NCVs

that he performs to the unique circumstances of any Insured.  Instead, he performs NCVs on the

same peripheral nerves and nerve fibers for virtually every Insured.  Specifically, Dr. Burke

virtually always performs NCVs on the same 8 motor nerves and 8 sensory nerves for every

Insured.  See Ex. B.

25.    Even if there were any need for any of the NCVs that Dr. Burke performs (which

there is not), the nature and number of the NCVs that he performs grossly exceeds the maximum

number of such tests which should be necessary in at least 90% of all patients with a suspected

diagnosis of radiculopathy.  As recognized in the Recommended Policy, the maximum number

of NCVs which should be necessary to diagnose a radiculopathy in 90% of patients is 3 motor

nerves and 2 sensory nerves, whereas Dr. Burke performs NCVs on 8 motor nerves and 8

sensory nerves.  Compare Exs. A and B.

26.    Dr. Burke's cookie-cutter approach with the NCVs is designed solely to maximize

the charges that he submits to State Farm and other insurers.  Specifically, if all other conditions

11

of coverage are satisfied, the fee schedule governing No-Fault Benefits permits lawfully licensed health care professionals to submit maximum charges of (a) $106.47 for each sensory nerve in any limb on which an NCV is performed and (b) $166.47 for each motor nerve in any limb on which an NCV is performed. Dr. Burke performs all of the above-described NCVs on virtually every Insured and submits the maximum charges under the relevant fee schedule for each such Test solely to maximize the profits that can be reaped from each such Insured.

### 2.  SEPs

27.    SEPs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The potentials—brain waves—evoked by this electrical stimulation are then recorded by electrodes attached to the scalp. According to the Recommended Policy, radiculopathies are not among the diagnoses for which SEPs have any demonstrated usefulness. Consistent with the Recommended Policy, the Medicare guidelines which have been established by the United States Department of Health and Human Services also establish that SEPs are not useful to diagnose radiculopathies. Indeed, in a September 9, 2005 examination under oath, Dr. Elfiky (who performed many of the Consultations at issue) testified that that he uses SEPs only to diagnose multiple sclerosis and that he would never use SEPs to diagnose a radiculopathies. Yet, when Dr. Burke purportedly performs SEPs on Insureds, he purportedly does so for the purpose of diagnosing radiculopathies.

28.    Even if SEPs had any clinical utility (which they do not) in diagnosing radiulopathies, the decision whether to use them to test the nerves running from the arms or legs to the brain should be tailored to each patient's unique circumstances. As a result, the type of SEPs performed should vary by patient.

29.    As set forth in Ex. B, Dr. Burke does not tailor the SEPs that he performs to the unique circumstances of any Insured. Instead, when Dr. Burke performs SEPs, he routinely does

12

so on the nerves running from both the arms and legs. This cookie-cutter approach with the SEPs is designed solely to maximize the charges submitted to State Farm and other insurers. Specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed health care professionals to submit maximum charges of $302.50 if SEPs are performed on the nerves running from the legs to the brain, and $302.50 if SEPs are performed on the nerves running from the arms to the brain. Dr. Burke performs SEPs on the nerves running from both the arms and legs to the brain to facilitate the submission to State Farm and other insurers of the maximum charges under the Fee Schedule for such Tests—$605. This is done solely to maximize the profits that can be reaped from each such Insured.

### 3. BEPs

30. BEPs are used to measure responses in brain waves that are stimulated by a clicking sound to evaluate the central auditory pathways of the brain. The test is accomplished by placing the individual in a chair or bed, and requesting that he/she relax and remain still. Electrodes are placed on the individual's scalp and on each earlobe. Clicking noises or tone bursts are then piped through earphones, and the electrodes pick up the brain's response and record it on a graph.

31. Legitimate clinical applications of BEPs are primarily used in the following two situations: (a) to assess hearing in newborns, and (b) to assess for tumors of the auditory nerve (i.e., acoustic neuroma).

32. Rarely are BEPs used for other purposes, among them intraoperative monitoring during neurosurgery of the brainstem; assessing hearing in individuals incapable of giving voluntary responses (e.g., young children, non-cooperative or non-communicative patients); and

13

in the diagnosis of neurological conditions affecting the brainstem, principally multiple sclerosis and, less often, brainstem tumors.

33.     None of the Insureds had any condition for which BEPs would have been of any benefit.   Nevertheless, Dr. Burke purportedly performed BEPs on many of the Insureds, in addition to all of the other medically unnecessary Tests.  See Ex. B.

**D.     State Farm's Justifiable Reliance**

34.     The defendants have attested to the medical necessity and validity of charges for the Consultations and Tests.  In addition, the defendants have represented that the Fraudulently Incorporated PCs were legitimate professional service corporations and eligible to receive No-Fault Benefits.  Defendants are obligated legally and ethically to act honestly and with integrity.

35.     To induce State Farm to promptly pay the fraudulent charges for professional services, including for the Consultations and Tests, the Fraudulently Incorporated PCs have hired law firms to pursue collection of the fraudulent charges from State Farm and other insurers.  These law firms routinely file expensive and time consuming litigation against State Farm and other insurers if the charges are not promptly paid in full.

36.     State Farm is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to justifiably rely on them.  As a result, State Farm has incurred damages of more than $1,750,000 based upon the fraudulent charges.

37.     Based upon the defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and should not reasonably

have discovered that its damages were attributable to fraud until shortly before it filed its complaint.

## III.     JURISDICTION AND VENUE

38.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq.* ("RICO") because they arise under the laws of the United States.  Pursuant to 28 U.S.C. § 1367, this Court also has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

39.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here. Venue is also proper pursuant to 18 U.S.C. § 1965(a) and (b) because defendants reside, are found, have an agent and transact affairs in this district, and the ends of justice require it.

## IV.     PARTIES

40.     Plaintiff State Farm Mutual Automobile Insurance Company is a corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois. It is licensed and engages in the business of insurance in virtually every state.

41.     Defendant Hisham Elzanaty resides in and is a citizen of New York.  Elzanaty has never been individually licensed to practice a profession.  Yet, he secretly and unlawfully owned and controlled Accurate Medical, P.C., J P Medical, P.C. and Quality Medical Health Care Provider P.C.

42.    Defendant Jadawiga Pawlowski, M.D., resides in and is a citizen of New York. At all times relevant, Dr. Pawlowski has been licensed by and practiced medicine in the State of New York.  Dr. Pawlowski falsely purported to own, control and practice through Accurate Medical, P.C., J P Medical, P.C. and Quality Medical Health Care Provider, P.C.  In fact, Dr. Pawlowski never provided or supervised any of the services purportedly rendered by any of these professional service corporations, and never had any actual ownership or control over them.

43.    Defendant David Burke, M.D., resides in and is a citizen of New York.  At all times relevant, Dr. Burke has been licensed by and practiced medicine in the State of New York.

44.    Defendant Accurate Medical, P.C. is a New York professional service corporation with its principal place of business in New York.  Dr. Pawlowski falsely purports to own, control and practice through Accurate Medical P.C., which in fact is secretly owned and controlled by Hisham Elzanaty.

45.    Defendant J P Medical, P.C. is a New York professional service corporation with its principal place of business in New York.  Dr. Pawlowski falsely purports to own, control and practice through J P Medical P.C., which in fact is secretly owned and controlled by Hisham Elzanaty.

46.    Defendant Quality Medical Health Care Provider, P.C. is a New York professional service corporation with its principal place of business in New York.  Dr. Pawlowski falsely purports to own, control and practice through Quality Medical Health Care Provider, P.C., which in fact is secretly owned and controlled by Hisham Elzanaty.

## V.    CAUSES OF ACTION

### First Cause of Action against the Fraudulently Incorporated PCs
#### (Under 28 U.S.C. § 2201)

47.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 46 above.

48.    There is an actual case and controversy between State Farm and the Fraudulently Incorporated PCs as to all professional charges, including charges for the Consultations and Tests, that have not been paid. State Farm contends that the Fraudulently Incorporated PCs are not entitled to coverage for No-Fault Benefits for any of these charges.

49.    Because the defendants knowingly have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that the Fraudulently Incorporated PCs have submitted to State Farm they are not entitled to any coverage for No-Fault Benefits for any of the professional charges, including the Consultations and Tests, at issue.

50.    Accordingly, State Farm seeks a judgment declaring that the Fraudulently Incorporated PCs are not entitled to collect No-Fault Benefits for any of the unpaid professional charges, including unpaid charges for the Consultations Tests, as well as any other relief the Court deems just and proper.

### Second Cause of Action Against Hisham Elzanaty, Dr. Pawlowski and Dr. Burke
#### (Violation of 18 U.S.C. 1962(c))

51.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 46 above.

52.     Hisham Elzanaty, Dr. Pawlowski, Dr. Burke and the Fraudulently Incorporated PCs are an association-in-fact "enterprise" ("the Fraudulent Testing Enterprise") as that term is defined in 18 U.S.C. §1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose.  Specifically, Hisham Elzanaty secretly and unlawfully owns and controls the Fraudulently Incorporated PCs for the purpose of profiting from the fraudulent charges for the Consultations and Tests; Dr. Pawlowski falsely purports to own, control and practice through the Fraudulently Incorporated PCs to unlawfully enable Hisham Elzanaty to profit from the fraudulent charges for the Consultations and Tests; Dr. Burke purports to perform and interpret the medically unnecessary Tests to enable Hisham Elzanaty to profit form the fraudulent charges for the Consultations and Tests; and the Fraudulently Incorporated PCs are ostensibly independent entities—with different names and tax identification numbers—that Hisham Elzanaty and Dr. Pawlowski created as the vehicles to accomplish a common purpose, namely the submission of fraudulent charges to State Farm and other insurers for the Consultations and Tests.  Hisham Elzanaty and Dr. Pawlowski created the Fraudulently Incorporated PCs with different names and tax identification numbers to enable the volume and pattern of the fraudulent charges for the Consultations and Tests to fly under the radar of State Farm and other insurers by reducing the volume and pattern of such charges coming from any one of the Fraudulently Incorporated PCs.  Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Fraudulent Testing Enterprise acting singly or without the aid of each other.

18

53.     Hisham Elzanaty, Dr. Pawlowski and Dr. Burke are employed by and associated with the Fraudulent Testing Enterprise.

54.     Hisham Elzanaty, Dr. Pawlowski and Dr. Burke have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Fraudulent Testing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit to State Farm and other insurers hundreds of fraudulent bills for the Consultations and Tests. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Ex. B attached hereto.

55.     State Farm has been injured in its business and property by reason of defendants' above-described conduct in that it has paid more than $1,750,000 based upon the fraudulent charges.

56.     By reason of this injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### Third Cause of Action Against Hisham Elzanaty, Dr. Pawlowski and Dr. Burke
(Violation of 18 U.S.C. 1962(d))

57.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 46 and 52 above.

58.     Defendants Hisham Elzanaty, Dr. Pawlowski and Dr. Burke have been employed by and associated with the Fraudulent Testing Enterprise.

59.     Defendants Hisham Elzanaty, Dr. Pawlowski and Dr. Burke have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Fraudulent Testing Enterprise's affairs through a pattern of racketeering activity consisting of

19

repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit to State Farm and other insurers hundreds of fraudulent bills for the Consultations and Tests. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Ex. B attached hereto.

60.     Each defendant knew of, agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission to State Farm and other insurance companies of fraudulent charges for the Consultations and Tests.

61.     State Farm has been injured in its business and property by reason of defendants' above-described conduct in that it has paid more than $1,750,000 based upon the fraudulent charges.

62.     By reason of this injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## Fourth Cause of Action against All Defendants
### (Common Law Fraud)

63.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 46 above.

64.     Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of fraudulent charges for the Consultations and Tests.  The false and fraudulent statements of material fact include the representations that billing code 99245 accurately represents the services provided in the Consultations, that the charge of $230 for the Consultations was appropriate, and that the Tests were medically necessary when, in fact, they were performed pursuant to a fraudulent pre-

determined protocol designed solely to maximize profits.  The date, the nature of the misrepresentations and the identity of the parties who made and caused these misrepresentations to be made in each and every claim are identified in the chart attached hereto as Exhibit B.

65.     The defendants made these false and fraudulent statements to induce State Farm to pay charges which were not compensable under the No-Fault Laws, including charges for the performance and interpretation of medically unnecessary Consultations and Tests.

66.     State Farm justifiably relied on the defendants' false and fraudulent representations, and as a proximate result has incurred damages of more than $1,750,000 based upon the fraudulent charges.

67.     The defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty which entitles State Farm to recover punitive damages.

68.     Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### Fifth Cause of Action against All Defendants
#### (Unjust Enrichment)

69.     State Farm realleges and incorporates by reference as if set forth in full herein the allegations contained in paragraphs 1 through 46.

70.     When State Farm paid the charges for the Consultations and Tests, State Farm reasonably believed the defendants' false and fraudulent representations that the Consultations and Tests were medically necessary and that the charges were valid.

71.     State Farm paid more than $1,750,000 in charges for the fraudulent Consultations and Tests, reasonably believing it was obligated to do so.

72.     State Farm's payment of charges for the fraudulent Consultations and Tests

constitute a benefit which the defendants voluntarily accepted.

73.     The defendants wrongfully obtained payments from State Farm through their fraudulent conduct.

74.     The defendants' retention of these benefits violates fundamental principles of justice, equity and good conscience.

**Sixth Cause of Action against Accurate Medical, P.C.
J P Medical, P.C., Quality Medical Health Care
Provider, P.C., Jadawiga Pawlowski, M.D. and Hisham Elzanaty**
(Common Law Fraud)

75.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 46 above.

76.     Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of fraudulent charges for medical services, including the Consultations and Tests.  The false and fraudulent statements of material fact in every claim submitted by the Fraudulently Incorporated PCs to State Farm was that they were properly licensed to provide the medical services relating to their charges when, in fact they were not; instead, they were fraudulently incorporated and not eligible for any of the No-Fault Benefits which they induced State Farm to pay to them.

77.     The defendants made these false and fraudulent statements to induce State Farm to pay No-Fault Benefits to the Fraudulently Incorporated PCs.

78.     State Farm justifiably relied on the defendants' false and fraudulent representations, and as a proximate result has incurred damages of more than $1,000,000 based upon the fraudulent charges for services rendered after April 4, 2002.

79.     The defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty which entitles State Farm to recover punitive damages.

80. Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**Seventh Cause of Action against Accurate Medical, P.C.**
**J P Medical, P.C., Quality Medical Health Care**
**Provider, P.C., Jadawiga Pawlowski, M.D. and Hisham Elzanaty**
(Unjust Enrichment)

81. State Farm realleges and incorporates by reference as if set forth in full herein the allegations contained in paragraphs 1 through 46.

82. When State Farm paid the Fraudulently Incorporated PCs, State Farm reasonably believed that they were lawfully authorized to practice medicine and were operating in compliance with New York law.

83. State Farm paid the Fraudulently Incorporated PCs more than $1,000,000, reasonably believing it was obligated to do so.

84. State Farm's payments to the Fraudulently Incorporated PCs constitute a benefit which the defendants voluntarily accepted.

85. The defendants wrongfully obtained payments from State Farm through their fraudulent conduct.

86. The defendants' retention of these benefits violates fundamental principles of justice, equity and good conscience.

WHEREFORE, Plaintiff demands that a Judgment be entered in its favor:

(a) on its First Cause of Action, declaring that none of the Fraudulently Incorporated PCs have any right to receive payment for any pending bills for professional services, including bills for the Consultations and Tests;

23

(b)   on its Second Cause of Action against Hisham Elzanaty, Dr. Pawlowski and Dr. Burke for more than $1,750,000 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c) plus interest;

(c)   on its Third Cause of Action against Hisham Elzanaty, Dr. Burke and Dr. Pawlowski for more than $1,750,000 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c) plus interest;

(d)   on its Fourth Cause of Action against all defendants, for more than $1,750,000 in compensatory damages plus punitive damages in an amount to be determined at trial and interest;

(e)   on its Fifth Cause of Action against all defendants, for more than $1,750,000 in compensatory damages plus interest;

(f)   on its Sixth Cause of Action against Accurate Medical, P.C., J P Medical, P.C., Quality Medical Health Care Provider, P.C., Jadawiga Pawlowski, M.D. and Hisham Elzanaty, for more than $1,000,000 in compensatory damages plus punitive damages in an amount to be determined at trial and interest;

(g)   on its Seventh Cause of Action against Accurate Medical, P.C., J P Medical, P.C., Quality Medical Health Care Provider, P.C., Jadawiga Pawlowski, M.D. and Hisham Elzanaty, for more than $1,000,000 in compensatory damages plus interest; and

(h)   awarding Plaintiff its costs including reasonable attorneys' fees, and any other relief the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.


Dated: January 5, 2007
       New York, New York


                KATTEN MUCHIN ROSENMAN LLP

By: _____
            Ross O. Silverman (RS 4567)
            Jay Shapiro (JS 2499)
            Keir N. Dougall (KD 5252)
            Alexis Cirel (AC 9067)
            Attorneys for Plaintiffs
            575 Madison Avenue
            New York, NY 10022
            (212) 940-8800

                 -and-

            Barry I. Levy (BL 2190)
            SHAPIRO, BEILLY, ROSENBERG
             ARONOWITZ, LEVY & FOX LLP
            225 Broadway – 13th Floor
            New York, NY 10007
            (212) 267-9020

American Association of
Neuromuscular &
Electrodiagnostic Medicine

Recommended Policy
for Electrodiagnostic Medicine



# Recommended Policy for Electrodiagnostic Medicine

## American Association of Neuromuscular & Electrodiagnostic Medicine
### American Academy of Neurology
### American Academy of Physical Medicine and Rehabilitation

## Executive Summary

The electrodiagnostic medicine (EDX) consultation is an important and useful extension of the clinical evaluation of patients with disorders of the peripheral and/or central nervous system. EDX tests are often crucial to evaluating symptoms, arriving at a proper diagnosis, and in following a disease process and its response to treatment in patients with neuromuscular disorders. Unfortunately, EDX studies are poorly understood by many in the medical and lay communities. Even more unfortunate, these studies have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources. The American Association of Neuromuscular & Electrodiagnostic Medicine (AANEM [formerly AAEM]) has developed this model policy to improve the quality of patient care, to encourage appropriate utilization of the procedures involved, and to assist Medicare Carrier Advisory Committees and other insurance carriers in developing policy regarding EDX testing. This document contains recommendations which can be used in developing and revising current reimbursement guidelines.

This document is based on the AANEM's publication, *The Electrodiagnostic Medicine Consultation*, and was further refined by consensus at a conference of 43 experts in the field of electrodiagnostic medicine held on April 8, 1994, in Chicago, Illinois. This consensus conference was held to produce guidelines that could be used to identify overutilization. Participants in the conference represented a diversity of practice types and were either neurologists or physiatrists and included the AANEM Board of Directors, committee chairs, Professional Practice Committee members, and other members of the association. Physicians from both academic medical centers and private practice were represented. With the help of the AANEM Professional Practice Committee, the guidelines have continuously been expanded to produce this comprehensive policy regarding the optimal use of EDX procedures.

This document provides:

1. An introduction to the mission of the AANEM.

2. An overview of the scope of electrodiagnostic medicine.

3. Indications for the performance of EDX testing.

4. A list of applicable American Medical Association Current Procedural Terminology (CPT™) codes.

5. A recommended source for a list of ICD-9-CM diagnosis codes that are acceptable indications for needle electromyography (EMG) and nerve conduction procedures.

6. An overview of nerve conduction studies (NCSs).

7. An overview of needle EMG.

8. An overview of late responses, including H-reflex and F-wave studies.

9. An overview of blink reflexes.

10. An overview of neuromuscular junction (NMJ) studies

11. An overview of somatosensory evoked potentials (SEPs).

12. An overview of autonomic nervous system function testing.

13. A recommended maximum number of EDX studies necessary for certain diagnostic categories in 90% of cases.

14. Information regarding the timing of EDX testing after an injury.

15. Recommended reasonable limits on the frequency of EDX testing in individual patients.

16. Recommended minimum standards for EDX testing that must be met under this policy.

17. A list of nerves to assist in coding for nerve conduction studies.

Recognizing the critical need for testing individualized to the patient's condition, it is necessary that physicians have flexibility to design and carry out the appropriate EDX studies. However, the peer-review mechanism should be triggered when patterns of electrodiagnostic test utilization significantly and consistently deviate from established norms for numbers and types of procedures. Individuals may obtain the names of American Board of Electrodiagnostic Medicine (ABEM) certified physicians from the ABEM directory found on the ABEM website at www.abemexam.org. These physicians can be contacted to review questionable cases, assist in the review process, and advise on claims that appear to be unusually excessive.

1

## The American Association of Neuromuscular & Electrodiagnostic Medicine

Founded in 1953 and currently numbering over 4900 physicians, primarily neurologists and physiatrists, the AANEM is the largest organization worldwide dedicated solely to the scientifically based advancement of neuromuscular medicine. The primary goal of the AANEM is to increase the quality of patient care, specifically for those patients with disorders of the central and peripheral nervous systems, the neuromuscular junction, and skeletal muscle by contributing to steady improvement in the methods of diagnosing and treating patients with disorders of muscle and nerve. This goal is accomplished through programs in education, research, and quality assurance.

The AANEM publishes a wide range of educational material and sponsors annual didactic programs, symposia, courses, and workshops. The AANEM informs its members about both basic and clinical research activities in electrodiagnostic medicine and neuromuscular diseases through its annual meeting sessions, the journal *Muscle & Nerve*, videotapes, monographs, case reports, and other educational material. In so doing, the AANEM fosters the conduct of and enhances the quality of this research. The AANEM also offers a Training Program Self-Assessment Examination annually. This examination is an educational tool which is often used by training programs for their residents, fellows, and faculty members. The examination offers an opportunity for individuals to assess their knowledge of electrodiagnostic medicine.

The American Board of Electrodiagnostic Medicine is an independent credentialing body in electrodiagnostic medicine. Although it is organized and operated as a committee of the AANEM, it is completely autonomous for purposes of credentialing criteria and procedures. The ABEM's goal is to enhance the quality of patient care through a voluntary certification process and thereby serve the public interest. The ABEM holds an annual examination through which candidates are able to assess their level of competence.

The ABEM established a maintenance of certification program to provide a mechanism for ABEM Diplomates to demonstrate their continuing education in electrodiagnostic medicine as they keep up-to-date with this medical specialty. Diplomates are expected to demonstrate current medical knowledge and clinical problem-solving skills in periodic recertification examinations. Certification is limited to 10 years. The first time-limited certificates were issued in 1994.

The AANEM is committed to the development of medically sound and clinically relevant guidelines for electrodiagnostic medicine. This is accomplished through literature review, expert opinion, and consensus of AANEM leaders and committee members, as well as input from the general membership and other experts in the field. The AANEM has published *Somatosensory Evoked Potentials: Clinical Uses and Guidelines in Somatosensory Evoked Potentials*, and specific guidelines on median nerve entrapment at the wrist (carpal tunnel syndrome) are included in the AANEM's *Practice Parameter* for Electrodiagnostic Studies in Carpal Tunnel Syndrome. The AANEM's *Practice Parameter for Electrodiagnostic Studies in Ulnar Neuropathy at the Elbow* provides specific guidelines on nerve compression in the region of the elbow. The AANEM's *Practice Parameter for Needle Electromyographic Evaluation of Patients With Suspected Cervical Radiculopathy* provides specific guidelines of the needle EMG examination for patients with suspected cervical radiculopathy. The AANEM has also published papers on myasthenia gravis, laryngeal EMG, multifocal motor neuropathy, and many more. (Documents mentioned in this paragraph are available through the AANEM Executive Office for a small fee.)

## Scope of Electrodiagnostic Medicine

Patients are referred for electrodiagnostic studies by neurologists and physiatrists trained in neuromuscular diagnosis, as well as by internists, primary care physicians, neurological and orthopaedic surgeons, and other healthcare providers. The AANEM has published *Referral Guidelines for Electrodiagnostic Medicine Consultations* (available through the AANEM Executive Office) to assist primary care physicians in determining if referral for an EDX consultation could be useful for their patients. Some patients are referred for EDX testing with a provisional diagnosis; others are not. Many patients are referred with merely symptoms and/or clinical findings and there is an expectation that the EDX consultant will be able to arrive at the correct diagnosis only after the completion of the EDX consultation.

After taking a history and examining the patient, the consultant develops a working diagnosis that may modify the referral diagnosis. The consultant's working diagnosis may also be modified as the study proceeds. A number of tests may be needed to address the referral and working diagnoses, and to arrive at the correct final diagnosis. A final diagnosis does not reflect either the decision-making process or the work performed that led to the diagnosis being established.

Furthermore, EDX testing does not always establish an etiologic diagnosis. When "rule-out" diagnoses are not

accepted, only a symptomatic diagnosis (e.g., ICD-9-CM code 729.5 "pain in limb" or 782.0 "disturbance in skin sensation") can be coded regardless of the work involved in performing the EDX consultation.

EDX studies are performed by physicians (generally neurologists or physiatrists) as part of an EDX consultation. EDX consultations include history-taking, appropriate physical examination, and the design, performance, and interpretation of EDX studies. These consultations usually take a minimum of 30 minutes to perform and can take up to 2 hours or more in particularly complicated clinical situations. Other healthcare professionals sometimes participate, either by assisting the physician consultant or by performing the NCSs under direct physician supervision.

Electrodiagnostic medicine includes a variety of electrodiagnostic studies, including NCSs (CPT codes 95900, 95903, and 95904), EMG (CPT codes 95860-95870), NMJ testing (CPT code 95937), and other specialized studies. EDX studies are an important means of diagnosing motor neuron diseases, myopathies, radiculopathies, plexopathies, neuropathies, and NMJ disorders (e.g., myasthenia gravis and myasthenic syndrome). EDX studies are also useful when evaluating tumors involving an extremity, the spinal cord, and/or the peripheral nervous system, and in neurotrauma, low-back pain, and spondylosis and cervical and lumbosacral disc diseases.

Although a common problem such as tingling and numbness in the hand and arm (which could be due to lesions in the brain, spinal cord, cervical roots, brachial plexus, or nerves in the upper extremities) may be studied in a similar way by many EDX consultants, there is no single universally accepted specific protocol or set of procedures employed for each diagnostic category. Instead, the EDX consultant must continually reassess the findings encountered during the performance of the EDX testing; this new information may require modification of the initial study design to include other unplanned procedures and may require consideration of different alternative diagnostic possibilities. The EDX evaluation is not just a standard "test" like an electrocardiogram (EKG). EKG testing involves only recording techniques performed by a set protocol and is routinely delegated to nonphysician technical personnel for later interpretation by the physician. The EDX consultant does not "read" needle EMGs; he or she is integrally involved in performing a detailed study.

EDX studies are individually designed by the EDX consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained. The accuracy of needle EMG testing is dependent on the skill of the examiner. The diagnostic interpretation of the needle EMG examination takes place during the performance of the test. Thus, this evaluation constitutes the practice of medicine. For these reasons, it is the position of the AANEM, along with the American Medical Association, the American Academy of Neurology, the American Academy of Physical Medicine and Rehabilitation, and the Department of Veterans Affairs (Veteran's Administration), as well as many state medical boards, that only physicians (MD or DO) should perform needle EMG examinations.

EDX consultants receive training during residency and/or in special electrodiagnostic fellowships after residency devoted to the performance of these studies and their interpretation. Knowledge of electrodiagnostic medicine is necessary to pass the board examinations given by the American Board of Physical Medicine and Rehabilitation and the American Board of Psychiatry and Neurology. In addition, there are two examinations specifically emphasizing electrodiagnostic medicine that are available to physicians who are qualified by training and experience: The American Board of Electrodiagnostic Medicine examination and the American Board of Psychiatry and Neurology's Added Qualifications in Clinical Neurophysiology examination.

For these reasons, the AANEM has traditionally held the position that the only person who can responsibly determine the appropriate tests to investigate a particular patient's clinical symptoms is the physician performing the EDX evaluation. The AANEM recognizes, however, that there is potential for overuse of some EDX procedures by individual providers and that judgments and decisions must be made regarding reimbursement policies for EDX testing. The approach of establishing limits on the number of procedures reimbursed per diagnostic category is fraught with difficulty.

A large number of limits are needed since there are many diagnostic categories. There is little relevant scientific literature on such limits; therefore, alternative approaches are preferable. For example, the peer-review mechanism can be triggered when patterns of EDX test utilization significantly and consistently exceed regional norms (for example, utilization of EDX testing above the 90% level).

This latter approach effectively limits abuse while still permitting the physician the latitude to use his or her best clinical judgment in evaluating the patient in order to provide the best, most cost-efficient patient care. It is the AANEM's desire that this model policy will be given serious consideration when revisions are made to reimbursement policies, so that policies recognize the high standards of practice currently existing in the medical community.

3

## Indications

EDX testing is used to evaluate the integrity and function of the peripheral nervous system (most cranial nerves, spinal roots, plexi, and nerves), NMJ, muscles, and the central nervous system (brain and spinal cord). EDX testing is performed as part of an EDX consultation for diagnosis or as follow-up of an existing condition. EDX studies can provide information to:

1. Identify normal and abnormal nerve, muscle, motor or sensory neuron, and NMJ functioning.

2. Localize region(s) of abnormal function.

3. Define the type of abnormal function.

4. Determine the distribution of abnormalities.

5. Determine the severity of abnormalities.

6. Estimate the date of a specific nerve injury.

7. Estimate the duration of the disease.

8. Determine the progression of abnormalities or of recovery from abnormal function.

9. Aid in diagnosis and prognosis of disease.

10. Aid in selecting treatment options.

11. Aid in following response to treatment by providing objective evidence of change in neuromuscular function.

12. Localize correct locations for injection of intramuscular agents (e.g., botulinum toxin).

## Current Procedural Terminology Codes in Electrodiagnostic Medicine

This document applies to the following CPT codes:

### Code: Descriptor

51785: Needle electromyography (EMG) studies of anal or urethral sphincter, any technique

51792: Stimulus evoked response (e.g., measurement of bulbocavernosus reflex latency time)

95860: Needle electromyography; one extremity, with or with out related paraspinal areas

95861: Needle electromyography; two extremities, with or without related paraspinal areas

95863: Needle electromyography; three extremities, with or without related paraspinal areas

95864: Needle electromyography; four extremities, with or without related paraspinal areas

95867: Needle electromyography; cranial nerve supplied muscle(s), unilateral

95868: Needle electromyography; cranial nerve supplied muscles, bilateral

95869: Needle electromyography; thoracic paraspinal muscles (excluding T1 or T12)

95870: Needle electromyography; limited study of muscles in one extremity or non-limb (axial) muscles (unilateral or bilateral), other than thoracic paraspinal, cranial nerve supplied muscles, or sphincters

95872: Needle electromyography using single fiber electrode, with quantitative measurement of jitter, blocking and/or fiber density, any/all sites of each muscle studied

95900: Nerve conduction, amplitude and latency/velocity study, each nerve; motor, without F-wave study.

95903: Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with F-wave study

95904: Nerve conduction, amplitude and latency/velocity study, each nerve; sensory

(Use the List of Nerves on pages 15 and 16 to properly code 95900, 95903, and/or 95904)

95920: Intraoperative neurophysiology testing, per hour (List separately in addition to code for primary procedure)

95921: Testing of autonomic nervous system function; cardiovagal innervation, (parasympathetic function), including two or more of the following: heart rate response to deep breathing with recorded R-R interval, Valsalva ratio, and 30:15 ratio

95922: Testing of autonomic nervous system function; vasomotor adrenergic innervation, (sympathetic adrenergic function), including beat-to-beat blood pressure and R-R interval changes during Valsalva maneuver and at least 5 minutes of passive tilt

95923: Testing of autonomic nervous system function; sudomotor, including one or more of the following: quantitative sudomotor axon reflex test (QSART), silastic sweat imprint, thermoregulatory sweat test, and changes in sympathetic skin potential.

95925: Short-latency somatosensory evoked potential study, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system; in upper limbs

4

95926: Short-latency somatosensory evoked potential study, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system; in lower limbs

95927: Short-latency somatosensory evoked potential study, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system; in the trunk or head

95928: Central motor evoked potential study (transcranial motor stimulation); upper limbs

95929: Central motor evoked potential study (transcranial motor stimulation); lower limbs

95933: Orbicularis oculi (blink) reflex, by electrodiagnostic testing

95934: H-reflex, amplitude and latency study; record gastrocnemius/soleus muscle

95936: H-reflex, amplitude and latency study; record muscle other than gastrocnemius/soleus muscle

95937: Neuromuscular junction testing (repetitive stimulation, paired stimuli), each nerve, any one method

### Acceptable Diagnostic Codes

The AANEM publishes a coding guide that contains ICD-9-CM codes of relevance to electrodiagnostic medicine. A greatly condensed version of this document, *Selected ICD-9-CM Codes: By Diagnosis*, lists the codes most often used in EDX consultations. At a minimum, any list of acceptable diagnoses should include all the diagnoses in *Selected ICD-9-CM Codes: By Diagnosis* with a note that additional diagnoses may be considered with accompanying documentation. Because EDX testing in some patients does not establish an etiologic diagnosis, any list of ICD-9-CM codes for electrodiagnostic testing must include symptom codes (such as weakness, pain, or altered sensation), as well as codes for defined diseases.

### CPT Codes 95900-95904: Nerve Conduction Studies

#### Overview

1. NCSs (CPT codes 95900-95904) are performed to assess the integrity and diagnose diseases of the peripheral nervous system. Specifically, they assess the speed (conduction velocity, and/or latency), size (amplitude), and shape of the response. Pathological findings include conduction slowing, conduction block, no response, and/or low amplitude response.

NCS results can assess the degree of demyelination and axon loss in the segments of the nerve studied. This portion of the EDX consultation is performed by the physician alone or by a trained allied health professional under direct supervision of a physician trained in electrodiagnostic medicine.

2. A typical NCS examination includes the following:

   a. Development of a differential diagnosis by the EDX consultant, based upon appropriate history and physical examination.

   b. NCS of a number of nerves by recording and studying the electrical responses from peripheral nerves or the muscles they innervate, following electrical stimulation of the nerve. Usually surface electrodes are used for both stimulation and recording, though needle electrodes may be required in special cases.

   c. Completion of indicated needle EMG studies (see below) to evaluate the differential diagnosis and to complement the NCSs.

3. Motor, sensory, and mixed NCSs and late responses (F-wave and H-reflex studies) are frequently complementary and performed during the same patient evaluation.

4. Although the stimulation of nerves is similar across all NCSs, the characteristics of motor, sensory, and mixed NCSs are different and are discussed separately below. In each case, an appropriate nerve is stimulated and recording is made either from the appropriate nerves or from muscle supplied by the motor nerve.

   a. Motor NCSs (CPT codes 95900 and 95903) are performed by applying electrical stimulation at various points along the course of a motor nerve while recording the electrical response from an appropriate muscle. Response parameters include amplitude, latency, configuration, and motor conduction velocity.

   b. Sensory NCSs (CPT code 95904) are performed by applying electrical stimulation near a nerve and recording the response from a distant site along the nerve. Response parameters include amplitude, latency, configuration, and sensory conduction velocity.

   c. Mixed NCS (CPT code 95904-this may still be used to code for mixed studies, even though the reference to "mixed" was dropped from the descriptor) are performed by applying electrical

5

stimulation near a nerve containing both motor and sensory fibers (a mixed nerve) and recording from a different location along that nerve that also contains both motor and sensory nerve fibers. Response parameters include amplitude, latency, configuration, and both sensory and motor conduction velocity.

5. NCS reports should document the nerves evaluated, the distance between the stimulation and recording sites, the conduction velocity, latency values, and amplitude. The temperature of the studied limbs may be included. A final diagnosis, which, in some cases, may be a symptom diagnosis or a diagnosis of normal, is then made.

It is possible to include a hard copy of these studies as part of the medical chart; however, in most situations it does not add useful information to the report of the EDX consultant. Requiring hard copy as a condition for reimbursement is generally unnecessary and burdensome. A legitimate reason to make a request for the hard copy of neurophysiological data is to permit an independent expert to review the original material to provide an independent interpretation of the findings. There are clinical (second opinion) and medical-legal (dispute over the diagnosis) situations in which this type of review is indicated, although there are limitations to later interpretation of the hard copy. Other reasons for requesting hard copy may be if questions of over-utilization are at issue, or significant concerns exist regarding fraud and abuse. Anyone requiring hard copy of neurophysiologic data must notify the physician ahead of time, as many physicians do not store this data.

6. The number of nerves tested should be the minimum necessary to address the clinical issue. In almost all studies, this will appropriately include evaluation of 1 or more nerves that have normal test results.

7. Because the EDX evaluation is tailored to the individual patient, it is inappropriate to identify set numbers of acceptable studies for a given diagnosis. However, practice parameters and professional guidelines define general principles, and the AANEM's *The Electrodiagnostic Medicine Consultation* is useful in this regard. One mechanism for gauging utilization is to compare a practitioner's practice patterns against other physicians. Physicians who regularly (>10% of the time) differ from established norms might be asked to provide information about the characteristics of their patient population or practice style.

8. The CPT descriptor language, "Report 95900, 95903, and/or 95904 only once when multiple sites on the same nerve are stimulated or recorded" clarifies that "1 nerve" in the 3 nerve conduction CPT codes includes all different stimulation sites along the individual motor, sensory, or mixed nerves that are tested. To qualify as a single NCS refer to the List of Nerves on pages 15 and 16. Each line on the list of nerves refers to a different nerve and should be billed as an individual unit. It is inappropriate to bill more than one unit for "inching" or studying the same nerve by moving the stimulating electrode closer to the recording electrode. It should be noted that most nerves have a contralateral counterpart; bilateral testing is often necessary for comparison purposes and the nerve on each side may be billed separately. In addition, motor (CPT code 95900 or 95903), sensory (CPT code 95904), and mixed sensory (CPT code 95904) studies on an individual nerve are appropriately carried out and billed separately.

9. CPT codes 95903 and 95900 may appropriately be billed together for the same patient on the same day of service when multiple nerves are tested, some with and some without F waves, because in that case they describe 2 distinct and independent services provided on the same day. However, CPT codes 95903 and 95900 cannot be billed together for the same nerve in a given patient on a given day. It is appropriate to add modifier -59 when billing 95900 and 95903 to indicate separate and distinct procedures on the same patient on the same day.

## CPT Codes 95860–95870: Needle Electromyography

### Overview

1. Needle EMG (CPT codes 95860-95870) is performed to exclude, diagnose, describe, and follow diseases of the peripheral nervous system and muscle. Needle EMG refers to the recording and study of electrical activity of muscle using a needle electrode. This portion of the EDX consultation should always be performed by the physician.

2. A typical EMG examination includes the following:

   a. Development of a differential diagnosis by the EDX consultant, based upon appropriate history and physical examination.

   b. Completion of indicated NCSs (see above) to evaluate the differential diagnosis and to complement the needle EMG studies.

   c. Needle EMG testing of selected muscles. This is accomplished by inserting a needle electrode into appropriate muscles, one at a time.

The needle electrode allows the muscle's electrical characteristics at rest and during activity to be interpreted by the EDX consultant. This interpretation includes analysis of oscilloscope tracings and the characteristic sounds produced by electrical potentials. The final interpretation of the study is a synthesis by the EDX consultant of the patient's history, physical examination, and the preceding and following portions of the study.

3. The muscles studied will vary depending upon the differential diagnosis and the ongoing synthesis of new information obtained by the EDX consultant while the test is being performed.

4. Needle EMG studies are interpreted in real time, as they are being performed. Most electromyographic machines are unable to permanently copy the sounds produced during needle EMG testing. In addition, it is difficult and quite expensive to permanently copy needle EMG oscilloscope tracings. For this reason, these tracings should not be required.

5. Normal findings and abnormalities uncovered during the study are documented and interpreted. Needle EMG reports should document the muscles tested, and report the presence and type of spontaneous activity, as well as the characteristics of the voluntary unit potentials. A final diagnosis, which, in some cases, may be a symptom diagnosis or a diagnosis of normal, is made.

## CPT Codes 95860-95864: Extremity Needle Electromyography Studies

1. One unit of service, billed with any of the codes, 95860-95864 includes all muscles tested in a particular extremity or extremities, with or without related paraspinal muscles. In some instances, evaluation of the paraspinal musculature may either be contraindicated or not feasible. Some examples may include but are not limited to:

   (1) patients with disorders of coagulation or on anticoagulation medications, (2) history of surgery in paraspinal muscles, (3) infection in the paraspinal muscle region, (4) patient refusal, (5) inability to position a ventilator-dependent patient, and (6) diagnosis of a condition which eliminates the need to evaluate paraspinal muscles.

   The ultimate decision about the indication for paraspinal examination should be left to the EDX consultant, as is the decision about what other muscles should be examined.

2. Only 1 unit of service of codes 95860-95864 may be reported per patient for a given examination.

3. CPT codes 95860-95864 should be used for reporting complete studies of the extremities. These codes require evaluation of extremity muscles innervated by 3 nerves (for example, radial, ulnar, median, tibial, peroneal, femoral, not sub-branches) or 4 spinal levels, with a minimum of 5 muscles studied per limb.

4. Codes 95860-95864 can appropriately be reported in combination with CPT code 95869 (Needle electromyography; thoracic paraspinal muscles) only if paraspinals between T3-T11 are studied. If this occurs in more than 20% of cases, the payor may wish to consult with the provider in order to better understand the necessity of performing both of these tests. CPT code 95869 may not be billed with CPT codes 95860-95864 if only T1 and/or T2 are studied when an upper extremity was also studied.

5. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.

## CPT Codes 95867 and 95868: Needle Electromyography, Cranial Nerve Supplied Muscles

1. CPT code 95867 is used for the needle examination of 1 or more muscles supplied by cranial nerves on 1 side of the body. CPT code 95868 is used for the needle examination of 1 or more muscles supplied by cranial nerves on both sides of the body. These 2 CPT codes should not be reported together.

2. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.

## CPT Code 95869: Needle Electromyography; Thoracic Paraspinal Muscles

1. CPT code 95869 should be used when exclusively studying thoracic paraspinal muscles.

2. One unit can be billed, despite the number of levels studied or whether unilateral or bilateral.

3. Characteristics of the examination should be noted as described in the overview of needle EMG above.

7

## CPT Code 95870: Needle Electromyography; Limited Study of Muscles in One Extremity or Non-limb (Axial) Muscles (Unilateral or Bilateral), Other Than Thoracic Paraspinal, Cranial Nerve Supplied Muscles, or Sphincters

1. Code 95870 is used for limited testing of specific muscles during an examination. This code should be used only when the muscles tested do not fit more appropriately under another CPT code.

2. Code 95870 can be billed at 1 unit per extremity. The code can also be used for muscles on the thorax or abdomen (unilateral or bilateral). One unit may be billed for studying cervical or lumbar paraspinal muscles (unilateral or bilateral), regardless of the number of levels tested.

3. Multiple units of CPT code 95870 may be billed in a single study. However, if an individual physician's practice pattern reveals that multiple units of this code are used in more than 20% of the provider's needle EMG studies, the payor may wish to consult with the provider in order to better understand the necessity of providing multiple units of this service. In such cases, peer review of this pattern may be appropriate.

4. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.

5. CPT code 95870 may be billed with 95860-95864 if a limited study is performed in conjunction with a full-limb.

## CPT Code 95872: Single Fiber Electromyography

1. In single-fiber electromyography (SFEMG), a specially designed needle electrode is used to record and identify action potentials (APs) from individual muscle fibers. These recordings are used to calculate the neuromuscular jitter and the muscle fiber density (FD). Jitter is the variability in time between activation of the motor nerve and generation of the muscle fiber AP, and reflects the normality of nerve-muscle transmission. Jitter may be assessed by measuring the time variability between APs from 2 muscle fibers in the same voluntarily activated motor unit, or by stimulating the motor axon and measuring the variability between stimulus and APs in the responding muscle fibers.

   Normal jitter varies among muscles and among muscle fibers within individual muscles, but is generally in the range of 10 to 50 μs. To determine if jitter is abnormally increased, statistical analysis is performed on the results from recordings from a population of muscle fibers within each tested muscle. When neuromuscular transmission is sufficiently abnormal that nerve activation produces no muscle AP, blocking is seen. Increased jitter, blocking, or both, may occur in a variety of conditions, including primary disorders of neuromuscular transmission.

2. FD is a measurement of the mean number of muscle fibers belonging to the same motor unit detected by the SFEMG electrode at a number of different insertion sites during voluntary activation of the motor unit.

3. Needle EMG should be performed in at least 1 clinically involved muscle before attributing pathologic jitter or blocking to a neuromuscular transmission disorder.

4. The results of jitter testing in each muscle are reported as the mean jitter among all pairs of APs recorded during voluntary activation (or the mean jitter of all APs recorded during axonal stimulation), the percentage of pairs (or APs) in which blocking was seen, and the percentage of pairs (or APs) in which jitter was normal. FD is reported as the mean number of muscle fibers per motor unit at 20 recording sites for each muscle tested.

5. Jitter and FD may be measured in 1 or more muscles depending on the condition being evaluated and the results of testing.

6. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above, as well as specific discussion about the presence or absence of jitter and other abnormalities in the muscles tested.

## CPT Code 51785: Needle Electromyography of Anal or Urethral Sphincter, Any Technique

1. Under specific circumstances in which there is suspicion of injury to the sacral roots of the spinal cord, separate study of the anal sphincter is required since this is the only muscle accessible to needle EMG examination which receives its innervation through these roots. This testing may also be performed to assess the innervation and anatomic integrity of the sphincters.

2. In investigations of the function of the sacral roots, needle EMG study of the anal sphincter can be combined with electrically-elicited measurement of the bulbocavernosus reflex latency (CPT code 51792).

8

3. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.

## Late Responses: H-Reflex and F-Wave Studies

### Overview

1. Late responses are performed to evaluate nerve conduction in portions of the nerve more proximal (near the spine) and, therefore, inaccessible to direct assessment using conventional techniques. Electrical stimulation is applied on the skin surface near a nerve site in a manner that sends impulses both proximally and distally. Characteristics of the response are assessed, including latency.

2. F-wave and H-reflex studies provide information in the evaluation of radiculopathies, plexopathies, polyneuropathies (especially with multifocal conduction block or in suspected Guillain-Barré syndrome or chronic inflammatory demyelinating polyneuropathy), and proximal mononeuropathies. In some cases, they may be the only abnormal study.

3. The physician's report should identify the nerves evaluated and the F-wave and H-reflex characteristics, including latency.

### CPT Codes 95934 and 95936: H-Reflex Studies

1. CPT codes 95934 and 95936 are defined as unilateral H-reflex study codes and are intended to be reported per study. Typically, only two H-reflex studies are performed in a given examination.

2. H-reflex studies usually must be performed bilaterally because symmetry of responses is an important criterion for abnormality. When a bilateral H-reflex study is performed, the entire procedure must be repeated, increasing examiner time and effort; there are no economies of scale in multiple H-reflex testing. A bilateral H-reflex study should be reported by appending modifier "-50 Bilateral Procedure," to the CPT code reported.

3. H-reflex studies usually involve assessment of the gastrocnemius/soleus muscle complex in the calf (CPT code 95934). Bilateral gastrocnemius/soleus H-reflex abnormalities are often early indications of spinal stenosis, or bilateral S1 radiculopathies.

4. In rare instances, H-reflexes need to be tested in muscles other than the gastrocnemius/soleus muscle, for example, in the upper limbs. In conditions such as cervical radiculopathies or brachial plexopathies, an H-reflex study can be performed in the arm (flexor carpi radialis muscle). Other muscles that may be

tested, although rarely, are the intrinsic small muscles of the hand and foot. These cases would be coded using CPT code 95936.

### CPT Code 95903: Nerve Conduction Study With F-Wave Study

F-wave studies are billed in combination with the motor nerves that are examined (CPT code 95903). Although the set-up for an F-wave study is similar to the set-up for a motor NCS, the testing is performed separately from motor NCSs, utilizing different machine settings and separate stimulation to obtain a larger number of responses (at least 10).

1. The number of F-wave studies which need to be performed on a given patient depends on the working diagnosis and the EDX findings already in evidence. It may be appropriate in the same patient to perform some motor NCSs with an F wave and others without an F wave.

### CPT Code 95933: Blink Reflexes

#### Overview

1. The blink reflex (CPT code 95933) is an electrophysiologic analog of the corneal reflex. The latency of the responses, including side-to-side differences, can help localize pathology in the region of the fifth or seventh cranial nerves, or in the brainstem. The latencies and amplitudes of directly elicited facial motor responses should be determined to exclude a peripheral abnormality if the blink reflexes are abnormal.

2. Recordings should be made bilaterally with both ipsilateral and contralateral stimulation.

3. The report of this study should include the presence or absence of the R1 and R2 components on both sides and the latencies of recorded R1 and R2 components.

### CPT Code 95937: Neuromuscular Junction Studies

#### Overview

1. Repetitive stimulation studies (CPT code 95937) are used to identify and to differentiate disorders of the NMJ. This test consists of recording muscle responses to a series of nerve stimuli (at variable rates), both before, and at various intervals after, exercise or transmission of high-frequency stimuli.

2. These codes may be used in association with motor and sensory NCSs of the same nerves and are reimbursed separately.

3. When this study is performed, the physician's report should note characteristics of the test, including the rate of repetition of stimulations, and any significant incremental or decremental response.

## CPT Codes 95925-95927: Somatosensory Evoked Potentials

### Overview

Somatosensory Evoked Potentials (SEP's) (CPT codes 95925, 95926, and 95927) are an extension of the electro-diagnostic evaluation and can be used to test conduction in various sensory fibers of the peripheral and central nervous systems. SEPs may be used to assess the functional integrity of the central and peripheral sensory pathways.

Common diagnoses in electrodiagnostic medicine where SEPs have demonstrated usefulness include but are not limited to the following: spinal cord trauma, subacute combined degeneration, nontraumatic spinal cord lesions (e.g., cervical spondylosis), multiple sclerosis, spinocerebellar degeneration, myoclonus, coma, and intraoperative monitoring of spinal cord, brainstem, and brain sensory tracts. Intraoperative SEP monitoring is indicated for selected spine surgeries in which there is a risk of additional nerve root or spinal cord injury. Indications for SEP monitoring may include, but are not limited to, complex, extensive, or lengthy procedures, and when mandated by hospital policy. However, intraoperative SEP monitoring may not be indicated for routine lumbar or cervical root decompression.

SEPs are noninvasive studies performed by repetitive submaximal stimulation of a sensory or mixed sensorimotor peripheral nerve and recording the averaged responses from electrodes placed over proximal portions of the nerve stimulated, plexus, spine, and scalp. Amplitude, peak, and interpeak latency measurements with side-to-side comparisons are used to assess abnormalities.

1. The SEP study codes are separated into upper and lower limbs. A maximum of two codes are to be submitted for all upper or lower limb studies performed on a given patient on a given day. SBP study codes are defined as bilateral studies. A unilateral study using CPT codes 95925, 95926, or 95927 should be reported with modifier "-52, Reduced Services."

2. Depending on the clinical condition being investigated, several nerves in 1 extremity may have to be tested and compared with the opposite limb.

3. The physician's SEP report should note which nerves were tested, latencies at various testing points, and an evaluation of whether the resulting values are normal or abnormal.

## Autonomic Nervous System Function Testing

### Overview

The purpose of autonomic nervous system function testing is to determine the presence of autonomic dysfunction, the site of autonomic dysfunction, and the various autonomic systems which may be disordered.

### CPT Code 95921: Cardiovagal Innervation

Cardiovagal innervation tests provide a standardized quantitative evaluation of vagal innervation to the heart (parasympathetic function). The responses are based on the interpretation of changes in continuous heart rate recordings in response to standardized maneuvers. Impairment occurs in autonomic failure due to diseases such as Shy-Drager syndrome, idiopathic orthostatic hypotension, diabetic neuropathy, and other neuropathies affecting autonomic nerves.

### CPT Code 95922: Vasomotor Adrenergic Innervation

Vasomotor adrenergic innervation evaluates adrenergic innervation of the circulation and of the heart in autonomic failure due to diseases such as Shy-Drager syndrome, idiopathic orthostatic hypotension, diabetic neuropathy, and other neuropathies affecting autonomic nerves.

### CPT Code 95923: Evaluation of Sudomotor Function

Sudomotor function can be evaluated using any of the following methods:

1. A quantitative sudomotor axon reflex test (QSART) is a noninvasive test that evaluates the integrity of the distal postganglionic sympathetic nerve fibers which may be impaired in diabetic and other neuropathies affecting autonomic nerves and in progressive autonomic disorders. This test involves the stimulation of sympathetic nerve fibers to the sweat glands at standard sites by the iontophoresis of acetylcholine and measuring the evoked sweat response by sudorometers. The test is performed optimally on 1 forearm site and 3 sites on the lower extremities in order to determine the severity and distribution of the sympathetic deficit.

2. The silastic sweat imprint differs from QSART in that the recording is an imprint of the sweat droplets appearing as indentations on silastic material.

10

3. The thermoregulatory sweat test is a test of sympathetic nerves that supply the skin. The skin is dusted with an indicator powder which changes color when the patient sweats in response to raising the patient's temperature by raising the ambient temperature in a heat cabinet.

4. Sympathetic peripheral autonomic skin (or surface) potentials (PASPs) are evoked by electrical stimulation (of the skin) and electric potential recordings are made over the palm and soles of the feet. The PASP change is carried by autonomic nerve fibers and evaluates if these fibers are working normally.

5. When these evaluative tests are conducted, the physician's report should state which test(s) was/were conducted and whether the test results were normal or abnormal.

## Maximum Number of Tests Necessary in 90% of Cases

Table 1, "Maximum Number of Studies," summarizes the AANEM's recommendations regarding a reasonable maximum number of studies per diagnostic category necessary for a physician to arrive at a diagnosis in 90% of patients with that final diagnosis. The numbers in the table are to be used as a tool to detect outliers so as to prevent abuse and overutilization. Each number in the "Maximum Number of Studies Table" represents 1 study or unit. The maximum numbers, as shown in the table, are designed to apply to a diversity of practice styles, as well as practice types, including those at referral centers where more complex testing is frequently necessary. In simple, straightforward cases, fewer tests will be neces-

sary. This is particularly true when results of the most critical tests are normal. In complex cases, the maximum numbers in the table will be insufficient for the physician to arrive at a complete diagnosis. In cases where there are borderline findings, additional tests may be required to determine if the findings are significant.

The appropriate number of studies to be performed should be left to the judgment of the physician performing the EDX evaluation; however, in the small number of cases which require testing in excess of the numbers listed in the table (the AANEM estimates 10% of cases), the physician should be able to provide supplementary documentation to justify the additional testing. Such documentation should explain what other differential diagnostic problems needed to be ruled out in that particular situation. In some patients, multiple diagnoses will be established by EDX testing and the recommendations listed in Table 1 for a single diagnostic category will not apply. It should be noted that in some situations it is necessary to test an asymptomatic contralateral limb to establish normative values for an individual patient. Normal values based on the general population alone are less sensitive than this approach, therefore restrictions on contralateral asymptomatic limb testing will reduce the sensitivity of electrodiagnostic tests.

## Carpal Tunnel Syndrome

For suspected carpal tunnel syndrome (CTS), bilateral median motor and sensory NCSs are often indicated. The studies in the contralateral asymptomatic limb serve as controls in cases where values are borderline and may establish the presence of bilateral CTS, which is a

| Table 1: Maximum Number of Studies | | | | | |
|---|---|---|---|---|---|
| | Needle Electromyography, CPT 95860-95864 and 95867-95870 | Nerve Conduction Studies CPT 95900, 95903, 95904 | | Other Electromyographic Studies CPT 95934, 95936, 95937 | |
| Indication | Number of Services (Tests) | Motor NCS with And/or without F wave | Sensory NCS | H-Reflex | Neuromuscular Junction Testing (Repetitive stimulation) |
| Carpal Tunnel (unilateral) | 1 | 3 | 4 | | |
| Carpal Tunnel (bilateral) | 2 | 4 | 6 | | |
| Radiculopathy | 2 | 3 | 2 | 2 | |
| Mononeuropathy | 1 | 3 | 3 | 2 | |
| Polyneuropathy/Mononeuropathy Multiplex | 3 | 4 | 4 | 2 | |
| Myopathy | 2 | 2 | 2 | | 2 |
| Motor Neuronopathy (e.g., ALS) | 4 | 4 | 2 | | 2 |
| Plexopathy | 2 | 4 | 6 | 2 | |
| Neuromuscular Junction | 2 | 2 | 2 | | 3 |
| Tarsal Tunnel Syndrome (unilateral) | 1 | 4 | 4 | | |
| Tarsal Tunnel Syndrome (bilateral) | 2 | 5 | 6 | | |
| Weakness, Fatigue, Cramps, or Twitching (focal) | 2 | 3 | 4 | | 2 |
| Weakness, Fatigue, Cramps, or Twitching (general) | 4 | 4 | 4 | ... | 2 |
| Pain, Numbness, or Tingling (unilateral) | 1 | 3 | 4 | 2 | |
| Pain, Numbness, or Tingling (bilateral) | 2 | 4 | 6 | 2 | |

frequent finding. Two to 4 additional sensory or mixed NCSs can be compared to the median sensory NCSs to increase the diagnostic sensitivity of the testing. Three additional sensory NCSs and an additional motor NCS (usually ulnar) are indicated to exclude a generalized neuropathy or multiple mononeuropathies.

If 2 sensitive sensory NCSs are performed at the beginning start, additional sensory testing on the same limb is rarely needed. For suspected bilateral CTS, bilateral median motor and sensory NCSs are indicated. Up to 2 additional motor and 2 additional sensory NCSs are often indicated. The extent of the needle EMG examination depends on the results of the NCSs and the differential diagnosis considered in the individual patient.

Additional testing may be indicated in patients with a differential diagnosis which includes peripheral neuropathy, cervical radiculopathy, brachial plexopathy, or more proximal median neuropathy.

### Radiculopathy

A minimal evaluation for radiculopathy includes 1 motor and 1 sensory NCS and a needle EMG examination of the involved limb. However, the EDX testing can include up to 3 motor NCSs (in cases of an abnormal motor NCS, the same nerve in the contralateral limb and another motor nerve in the ipsilateral limb can be studied) and 2 sensory NCSs. Bilateral studies are often necessary to exclude a central disc herniation with bilateral radiculopathies or spinal stenosis or to differentiate between radiculopathy and plexopathy, polyneuropathy, or mononeuropathy. H reflexes and F waves can provide useful complementary information that is helpful in the evaluation of suspected radiculopathy and can add to the certainty of electrodiagnostic information supporting a diagnosis of root dysfunction.

Radiculopathies cannot be diagnosed by NCS alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by 1 physician supervising and/or performing all aspects of the study

### Polyneuropathy/Mononeuropathy Multiplex

In order to characterize the nature of the polyneuropathy (axonal or demyelinating, diffuse or multifocal) and in order to exclude polyradiculopathy, plexopathy, neuronopathy, or multiple mononeuropathies, it may be necessary to study 4 motor and 4 sensory nerves, consisting of 2 motor and 2 sensory NCSs in 1 leg, 1 motor and 1 sensory NCS in the opposite leg, and 1 motor and 1 sensory NCS in 1 arm. H-reflex studies and F-wave studies from 2 nerves may provide additional diagnostic information. At least 2 limbs should be studied by a needle

EMG examination. Studies of related paraspinal muscles are indicated to exclude some conditions such as polyradiculopathy.

### Myopathy

To diagnose a myopathy, a needle EMG examination of 2 limbs is indicated. To help exclude other disorders such as polyneuropathy or neuronopathy, 2 motor and 2 sensory NCSs are indicated. Two repetitive motor nerve stimulation studies may be performed to exclude a disorder of neuromuscular transmission.

### Motor Neuronopathy

In order to establish the diagnosis of motor neuronopathy (for example, amyotrophic lateral sclerosis [ALS or Lou Gehrig's disease]) and to exclude other disorders in the differential diagnosis, such as multifocal motor neuropathy or polyneuropathy, up to 4 motor nerves and 2 sensory nerves may be studied.

Needle EMG of up to 4 extremities (or 3 limbs and facial or tongue muscles) is often necessary to document widespread denervation and to exclude a myopathy. One repetitive motor nerve stimulation study may be indicated to exclude a disorder affecting neuromuscular transmission.

### Plexopathy

To characterize a brachial plexopathy and to differentiate it from cervical radiculopathy and mononeuropathies, it is often necessary to study all major sensory and motor nerves that can be easily studied in both upper extremities (radial, median, ulnar, and medial and lateral antebrachial cutaneous sensory; radial, median, ulnar, and possibly axillary and musculocutaneous motor) and to perform a needle EMG examination in both upper extremities. To characterize the lumbosacral plexopathy and to differentiate it from lumbar radiculopathy and mononeuropathies, it is often necessary to study all major sensory and motor nerves that can be easily studied in both lower extremities (superficial peroneal and sural sensory; peroneal and posterior tibial motor) and to perform a needle EMG examination in both lower extremities. F-wave studies in the motor nerves and soleus H reflexes also provide useful information.

### Neuromuscular Junction

To demonstrate and characterize abnormal neuromuscular transmission, repetitive nerve stimulation studies should be performed in up to 2 nerves and SFEMG in up to 2 muscles. If any of these are abnormal, up to 2 motor and 2 sensory NCSs may be performed to exclude neuropathies that can be associated with abnormal neuromuscular transmission. At least 1 motor and 1 sensory

12

Case Case cv-00-051-ENV-MDGcumDocument Filed 01/05/2007 40 Page 40 of 64 #: 646

NCS should be performed in a clinically involved limb, preferably in the distribution of a nerve studied with repetitive stimulation or SFEMG. At least 1 distal and 1 proximal muscle should be studied by a needle EMG examination to exclude a neuropathy or myopathy that can be associated with abnormal repetitive stimulation studies or SFEMG. At least 1 of the muscles should be clinically involved and both muscles should be in clinically involved limbs.

## Timing of Testing After an Injury

In combination, NCSs and a needle EMG examination may be most helpful when performed several weeks after the injury has occurred. However, NCSs are often useful acutely after nerve injury, for example, if there is concern that a nerve has been severed. In fact, if studies are delayed, the opportunity to precisely identify the region of injury or to intervene may be lost. In some cases, even needle EMG testing performed immediately after a nerve injury may demonstrate abnormal motor unit action potential (MUAP) recruitment and/or provide baseline information that can be helpful to document preexisting conditions, date the injury, or serve as a baseline for comparison with later studies.

Because of the variability of different nerve injuries, a standard rule on the timing of EDX testing cannot easily be established and the AANEM does not have specific recommendations in this regard. In all instances, the AANEM encourages dialogue between physicians and payors and encourages the appropriate use of the physician's clinical judgment in determining when studies are most appropriately performed and what studies should be conducted.

## Frequency of Electrodiagnostic Testing in a Given Patient

There are many clinical situations where good medical management requires repeat testing, such as in the following examples:

1. **Second diagnosis.** Where a single diagnosis is made on the first visit, but the patient subsequently develops a new set of symptoms, further evaluation is required for a second diagnosis that treatment can begin.

2. **Inconclusive diagnosis.** When a serious diagnosis (e.g., ALS) is suspected but the results of the needle EMG/NCS examination are insufficient to be conclusive, follow-up studies are needed to establish or exclude the diagnosis.

3. **Rapidly evolving disease.** Initial EDX testing in some diseases may not show any abnormality (e.g., Guillain-Barré syndrome) in the first 1 to 2 weeks. An early diagnosis confirmed by repeat electrodiagnosis must be made quickly so that treatment can begin. Follow-up testing can be extremely useful in establishing prognosis and monitoring patient status.

4. **Course of the disease.** Certain treatable diseases such as polymyositis and myasthenia gravis follow a fluctuating course with variable response to treatment. The physician treating such patients needs to monitor the disease progress and the response to therapeutic interventions. The results of follow-up evaluations may be necessary to guide treatment decisions.

5. **Unexpected course or change in course of the disease.** In certain situations, management of a diagnosed condition may not yield expected results or new, questionably related problems may occur (e.g., failure to improve following surgery for radiculopathy). In these instances, reexamination is appropriate.

6. **Recovery from injury.** Repeat evaluations may be needed to monitor recovery, to help establish prognosis, and/or to determine the need for and timing of surgical intervention (e.g., traumatic nerve injury).

Repeat EDX consultation is therefore sometimes necessary and, when justifiable, should be reimbursed. Reasonable limits can be set concerning the frequency of repeat EDX testing per year in a given patient by a given EDX consultant for a given diagnosis. The following numbers of tests per 12-month period per diagnosis per physician are acceptable:

1. Two tests for carpal tunnel-unilateral, carpal tunnel-bilateral, radiculopathy, mononeuropathy, polyneuropathy, myopathy, and NMJ disorders.

2. Three tests for motor neuronopathy and plexopathy.

These limits should **not** apply if the patient requires evaluation by more than 1 EDX consultant (i.e., a second opinion or an expert opinion at a tertiary care center) in a given year or if the patient requires evaluation for a second diagnosis in a given year.

Additional studies may be required or appropriate over and above these guidelines. In such situations, the reason for the repeat study should be included in the body of the report or in the patient's chart. Comparison with the previous test results should be documented. This additional documentation from the physician regarding the necessity for the additional repeat testing would be appropriate. Repeat EDX testing should not be necessary in a 12-month period in 80% of all cases.

13

## Minimum Standards

1. EDX testing should be medically indicated.

2. Testing should be performed using EDX equipment that provides assessment of all parameters of the recorded signals. Studies performed with devices designed only for "screening purposes" rather than diagnosis are not acceptable under this policy.

3. The number of tests performed should be the minimum needed to establish an accurate diagnosis.

4. NCSs should be either (a) performed directly by a physician or (b) performed by a trained individual under the direct supervision of a physician. Direct supervision means that the physician is in close physical proximity to the EDX laboratory while testing is underway, is immediately available to provide the trained individual with assistance and direction, and is responsible for selecting the appropriate NCSs to be performed.

5. The needle EMG examination must be performed by a physician specially trained in electrodiagnostic medicine, as these tests are simultaneously performed and interpreted.

6. It is appropriate for only 1 attending physician to perform or supervise all of the components of the electrodiagnostic testing (e.g., history taking, physical evaluation, supervision and/or performance of the electrodiagnostic test, and interpretation) for a given patient and for all the testing to occur on the same date of service. The reporting of NCS and EMG study results should be integrated into a unifying diagnostic impression.

7. In contrast, dissociation of NCS and EMG results into separate reports is inappropriate unless specifically explained by the physician. Performance and/or interpretation of NCSs separately from that of the needle EMG component of the test should clearly be the exception (e.g. when testing an acute nerve injury) rather than an established practice pattern for a given practitioner.

## Conclusion

Thoughtfully written reimbursement policies will positively impact patient care. On the other hand, poorly written policies may lead to diagnostic judgments based on inadequate information. The quality of patient care will suffer, the risk of patient injury will increase due to incorrect diagnosis, misdiagnosis, or improper treatment (e.g., unnecessary surgery), and the cost of medical care will escalate. In addition, underutilization of needed diagnostic testing may cost payors money. If the physician does not get the full information needed for proper diagnosis from an initial EDX consultation because the evaluation is inadequate, the consultation may need to be repeated in a more thorough manner with additional expense. It must also be emphasized that having to justify the reasons behind each CPT unit by separate narrative will be time-consuming and expensive for physician and insurance carrier alike, and will not allow for efficient electronic claims submission.

## Looking to the Future

Physicians expect that the development of practice parameters and outcome studies will profoundly influence the practice of medicine. As new EDX practice parameters and outcome studies are published, the AANEM plans to modify its guidelines as needed.

Practice parameter documents, however, may contain hierarchical decision trees that recommend modification of the planned EDX testing during the performance of the study in response to the information obtained as the study proceeds. Such a dynamic study design does not readily lend itself to a reductionistic bottom-line approach to the number of EDX studies allowed to be reimbursed per diagnosis.

The AANEM will gladly provide additional input in the future to help organizations establish medically appropriate practice guidelines for electrodiagnostic medicine from which new and improved coding and reimbursement policies could be developed.

Approved by the American Association of Neuromuscular & Electrodiagnostic Medicine: September 1997; updated 1998, 1999, 2000, 2001, 2002, and 2004.

Endorsed by the American Academy of Neurology: February 1998, February 2002, and June 2004.

Endorsed by the American Academy of Physical Medicine & Rehabilitation: June 1998, March 2002, and June 2004.

# List of Nerves with Added Specificity
## Appendix A

**Codes 95900 and 95903 involve the following nerves:**

I. **Upper Extremity/Cervical Plexus/Brachial Plexus Motor Nerves**

A. Axillary motor nerve to the deltoid
B. Long thoracic motor nerve to the serratus anterior
C. Median nerve
   1. Median motor nerve to the abductor pollicis brevis
   2. Median motor nerve, anterior interosseou branch, to the flexor pollicis longus
   3. Median motor nerve, anterior interosseous branch, to the pronator quadratus
   4. Median motor nerve to the first lumbrical
   5. Median motor nerve to the second lumbrical
D. Musculocutaneous motor nerve to the biceps brachii
E. Radial nerve
   1. Radial motor nerve to the extensor carpi ulnaris
   2. Radial motor nerve to the extensor digitorum communis
   3. Radial motor nerve to the extensor indicis proprius
   4. Radial motor nerve to the brachioradialis
F. Suprascapular nerve
   1. Suprascapular motor nerve to the supraspinatus
   2. Suprascapular motor nerve to the infraspinatus
G. Thoracodorsal motor nerve to the latissimus dorsi
H. Ulnar nerve
   1. Ulnar motor nerve to the abductor digiti minimi
   2. Ulnar motor nerve to the palmar interosseous
   3. Ulnar motor nerve to the first dorsal interosseous
   4. Ulnar motor nerve to the flexor carpi ulnaris
I. Other

II. **Lower Extremity Motor Nerves**

A. Femoral motor nerve to the quadriceps
   1. Femoral motor nerve to vastus medialis
   2. Femoral motor nerve to vastus lateralis
   3. Femoral motor nerve to vastus intermedialis
   4. Femoral motor nerve to rectus femoris.
B. Iloinguinal motor nerve

C. Peroneal nerve
   1. Peroneal motor nerve to the extensor digitorum brevis
   2. Peroneal motor nerve to the peroneus brevis
   3. Peroneal motor nerve to the peroneus longus
   4. Peroneal motor nerve to the tibialis anterior
D. Plantar motor nerve
E. Sciatic nerve
F. Tibial nerve
   1. Tibial motor nerve, inferior calcaneal branch, to the abductor digiti minimi
   2. Tibial motor nerve, medial plantar branch, to the abductor hallucis
   3. Tibial motor nerve, lateral plantar branch, to the flexor digiti minimi brevis
G. Other

II. **Cranial Nerves and Trunk**

A. Cranial nerve VII (facial motor nerve)
   1. Facial nerve to the frontalis
   2. Facial nerve to the nasalis
   3. Facial nerve to the orbicularis oculi
   4. Facial nerve to the orbicularis oris
B. Cranial nerve XI (spinal accessory motor nerve)
C. Cranial nerve XII (hypoglossal motor nerve)
D. Intercostal motor nerve
E. Phrenic motor nerve to the diaphragm
F. Recurrent laryngeal nerve
G. Other

IV. **Nerve Roots**

A. Cervical nerve root stimulation
   1. Cervical level 5 (C5)
   2. Cervical level 6 (C6)
   3. Cervical level 7 (C7)
   4. Cervical level 8 (C8)
B. Thoracic nerve root stimulation
   1. Thoracic level 1 (T1)
   2. Thoracic level 2 (T2)
   3. Thoracic level 3 (T3)
   4. Thoracic level 4 (T4)
   5. Thoracic level 5 (T5)
   6. Thoracic level 6 (T6)
   7. Thoracic level 7 (T7)
   8. Thoracic level 8 (T8)
   9. Thoracic level 9 (T9)
   10. Thoracic level 10 (T10)
   11. Thoracic level 11 (T11)
   12. Thoracic level 12 (T12)

15

C. Lumbar nerve root stimulation
1. Lumbar level 1 (L1)
2. Lumbar level 2 (L2)
3. Lumbar level 3 (L3)
4. Lumbar level 4 (L4)
5. Lumbar level 5 (L5)
D. Sacral nerve root stimulation
1. Sacral level 1 (S1)
2. Sacral level 2 (S2)
3. Sacral level 3 (S3)
4. Sacral level 4 (S4)

### Code 95904 involves the following nerves:

**I. Upper Extremity Sensory and Mixed Nerves**

A. Lateral antebrachial cutaneous sensory nerve
B. Medial antebrachial cutaneous sensory nerve
C. Medial brachial cutaneous sensory nerve
D. Median nerve
1. Median sensory nerve to the 1st digit
2. Median sensory nerve to the 2nd digit
3. Median sensory nerve to the 3rd digit
4. Median sensory nerve to the 4th digit
5. Median palmar cutaneous sensory nerve
6. Median palmar mixed nerve
E. Posterior antebrachial cutaneous sensory nerve
F. Radial sensory nerve
1. Radial sensory nerve to the base of the thumb
2. Radial sensory nerve to digit 1
G. Ulnar nerve
1. Ulnar dorsal cutaneous sensory nerve
2. Ulnar sensory nerve to the 4th digit
3. Ulnar sensory nerve to the 5th digit
4. Ulnar palmar mixed nerve
H. Intercostal sensory nerve
I. Other

**II. Lower Extremity Sensory and Mixed Nerves**

A. Lateral femoral cutaneous sensory nerve
B. Medial calcaneal sensory nerve
C. Medial femoral cutaneous sensory nerve
D. Peroneal nerve
1. Deep peroneal sensory nerve
2. Superficial peroneal sensory nerve, medial dorsal cutaneous branch
3. Superficial peroneal sensory nerve, intermediate dorsal cutaneous branch
E. Posterior femoral cutaneous sensory nerve
F. Saphenous nerve
1. Saphenous sensory nerve (distal technique)
2. Saphenous sensory nerve (proximal technique)
G. Sural nerve
1. Sural sensory nerve, lateral dorsal cutaneous branch
2. Sural sensory nerve
H. Tibial sensory nerve (digital nerve to toe 1)
I. Tibial sensory nerve (medial plantar nerve)
J. Tibial sensory nerve (lateral plantar nerve)
K. Other

**III. Head and Trunk Sensory Nerves**

A. Dorsal nerve of the penis
B. Greater auricular nerve
C. Opthalmic branch of the trigeminal nerve
D. Pudendal sensory nerve
E. Suprascapular sensory nerves
F. Other

\*This list has also been published in the American Medical Association's (AMA) newsletter *CPT Assistant* April 2003 issue (Volume 13, Issue4). This volume of the *CPT Assistant* can be purchased from the AMA by going to https://webstore.ama-assn.org/#2. Click on *CPT Assistant* Back Issues, search y Date, choose 2003 Issues and choose Apr 2003.



**AANEM**

421 First Avenue SW, Suite 300 East
Rochester, MN 55902
(507) 288-0100 / Fax: (507) 288-1225
aanem@aanem.org
www.aanem.org

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 32-V403-470 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 2/19/2002 |
| 2 | 32-A035-947 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate | David Burke, MD | 5/29/2002 |
| 3 | 32-A033-025 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 2/19/2002 |
| 4 | 32-A033-606 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 6/26/2002 |
| 5 | 32-V405-700 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 2/19/2002 |
| 6 | 32-V405-700 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 3/19/2002 |
| 7 | 32-A035-311 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 4/8/2002 |
| 8 | 32-V408-119 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 5/17/2002 |
| 9 | 30-V536-925 | | | No initial consultation | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 4/5/2002 |
| 10 | 32-V409-804 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 5/8/2002 |
| 11 | 32-V410-129 | 99245 | $230.00 | Accurate | Yes | 4/6 | No | | No | Accurate | David Burke, MD | 7/24/2002 |
| 12 | 32-V410-626 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 3/21/2002 |
| 13 | 32-V410-765 | | | No initial consultation | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 8/21/2002 |
| 14 | 32-V413-242 | 99245 | $230.00 | Accurate | Yes | 8/8 | yes | Both | Yes | Accurate | David Burke, MD | 4/24/2002 |
| 15 | 32-V413-242 | 99245 | $230.00 | Accurate | Yes | 8/6 | Yes | Both | Yes | Accurate | David Burke, MD | 4/24/2002 |
| 16 | 32-V410-992 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 5/15/2002 |
| 17 | 32-V411-562 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Arms | Yes | Accurate | David Burke, MD | 11/5/2002 |
| 18 | 32-V413-352 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Legs | Yes | Accurate | David Burke, MD | 5/12/2002 |

* All mailings in this column are bills mailed to State Farm.

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | 32-V412-287 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 7/31/2002 |
| 20 | 32-V412-846 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Legs | Yes | Accurate | David Burke, MD | 5/1/2002 |
| 21 | 32-V412-398 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 7/31/2002 |
| 22 | 32-V412-430 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 4/2/2002 |
| 23 | 32-V412-430 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 4/11/2002 |
| 24 | 32-A034-580 | 99245 | $230.00 | Accurate | No | | Yes | Both | Yes | Accurate | David Burke, MD | 6/26/2002 |
| 25 | 32-A034-580 | 99245 | $230.00 | Accurate | No | | Yes | Both | Yes | Accurate | David Burke, MD | 6/26/2002 |
| 26 | 32-A034-774 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Legs | No | Accurate | David Burke, MD | 6/26/2002 |
| 27 | 32-V425-011 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 6/6/2002 |
| 28 | 32-V425-011 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 7/31/2002 |
| 29 | 32-V416-715 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 5/22/2002 |
| 30 | 32-A036-259 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 7/17/2002 |
| 31 | 32-V417-729 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 11/6/2002 |
| 32 | 32-A035-807 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 7/25/2002 |
| 33 | 32-V418-953 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 5/22/2002 |
| 34 | 32-V423-485 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 6/26/2002 |
| 35 | 32-V434-726 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate | David Burke, MD | 5/29/2002 |
| 36 | 32-V421-070 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 7/31/2002 |
| 37 | 32-V420-399 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 8/7/2002 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | 32-V420-399 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate | David Burke, MD | 8/8/2002 |
| 39 | 32-V434-001 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 9/19/2002 |
| 40 | 32-A036-614 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 7/17/2002 |
| 41 | 32-V424-678 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 6/12/2002 |
| 42 | 32-V424-678 | 99245 | $230.00 | Accurate | Yes | 4/6 | No | | No | Accurate | David Burke, MD | 7/17/2002 |
| 43 | 32-V422-105 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Legs | Yes | Accurate | David Burke, MD | 7/17/2002 |
| 44 | 32-A037-443 | 99245 | $230.00 | Accurate | Yes | 4/6 | Yes | Both | Yes | Accurate | David Burke, MD | 7/31/2002 |
| 45 | 32-A037-443 | 99245 | $230.00 | Accurate | Yes | 4/2 | Yes | Both | Yes | Accurate | David Burke, MD | 7/1/2002 |
| 46 | 32-A039-050 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 7/31/2002 |
| 47 | 32-V430-465 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 10/3/2002 |
| 48 | 32-V429-538 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 8/14/2002 |
| 49 | 32-A040-985 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 11/20/2002 |
| 50 | 32-V433-583 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Arms | Yes | Accurate | David Burke, MD | 1/30/2003 |
| 51 | 32-V433-583 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 10/31/2002 |
| 52 | 32-V433-583 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Legs | Yes | Accurate | David Burke, MD | 11/10/2002 |
| 53 | 32-V433-536 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 10/17/2002 |
| 54 | 32-A039-436 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 10/24/2002 |
| 55 | 32-V434-828 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 8/20/2002 |
| 56 | 32-V434-828 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 9/5/2002 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57 | 32-5605-216 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/2/2003 |
| 58 | 32-V436-811 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 9/18/2002 |
| 59 | 32-V438-315 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 11/6/2002 |
| 60 | 32-V439-024 | 99245 | $230.00 | Accurate | Yes | 4/2 | No | | No | Accurate | David Burke, MD | 11/7/2002 |
| 61 | 30-V581-038 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 11/14/2002 |
| 62 | 32-A040-898 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 12/7/2002 |
| 63 | 32-A043-403 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Arms | No | Accurate | David Burke, MD | 10/24/2002 |
| 64 | 32-V447-799 | 99245 | $230.00 | Accurate | Yes | 3/8 | No | | No | Accurate | David Burke, MD | 1/2/2003 |
| 65 | 32-5605-441 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Arms | Yes | Accurate | David Burke, MD | 11/19/2002 |
| 66 | 32-V445-986 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 1/2/2003 |
| 67 | 32-V446-742 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 4/3/2003 |
| 68 | 32-V446-742 | 99245 | $230.00 | Accurate | Yes | 4/6 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 12/10/2002 |
| 69 | 32-V446-742 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 11/28/2002 |
| 70 | 32-A041-255 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/5/2003 |
| 71 | 32-V447-407 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Legs | Yes | Accurate | David Burke, MD | 2/5/2003 |
| 72 | 32-A041-898 | 99245 | $230.09 | Accurate | Yes | 4/2 | No | | No | Accurate | David Burke, MD | 2/13/2003 |
| 73 | 32-V597-254 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/22/2003 |
| 74 | 32-A041-655 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 1/21/2003 |
| 75 | 32-A041-655 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 1/29/2003 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 76 | 32-V450-633 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 12/11/2002 |
| 77 | 32-V450-543 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 1/14/2003 |
| 78 | 32-V451-524 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 2/5/2003 |
| 79 | 32-V451-923 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/14/2003 |
| 80 | 32-V453-170 | 99245 | $230.00 | Accurate | Yes | 4/6 | No | | No | Accurate | David Burke, MD | 1/30/2003 |
| 81 | 32-V455-221 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 4/9/2003 |
| 82 | 32-V456-880 | 99245 | $230.00 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 1/30/2003 |
| 83 | 32-V456-052 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/20/2003 |
| 84 | 32-A044-094 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/13/2003 |
| 85 | 32-A044-094 | 99245 | $230.00 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 1/16/2003 |
| 86 | 32-V460-774 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 3/5/2003 |
| 87 | 32-5607-069 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/29/2003 |
| 88 | 32-V457-691 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 3/11/2003 |
| 89 | 32-V459-134 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/12/2003 |
| 90 | 32-V459-513 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/13/2003 |
| 91 | 32-V459-802 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 2/5/2003 |
| 92 | 32-V459-997 | | | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 2/5/2003 |
| 93 | 32-5607-369 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 3/20/2003 |
| 94 | 32-V460-301 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 3/25/2003 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 95 | 32-A043-847 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/30/2003 |
| 96 | 32-A043-847 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/29/2003 |
| 97 | 32-A043-847 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 4/30/2003 |
| 98 | 32-V461-291 | 99245 | $230.00 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 1/30/2003 |
| 99 | 32-V461-291 | 99245 | $230.00 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 2/6/2003 |
| 100 | 32-V461-437 | 99245 | $230.00 | Accurate | No | | Yes | Legs | Yes | JP | David Burke, MD | 2/27/2003 |
| 101 | 32-V461-673 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/14/2003 |
| 102 | 32-V461-673 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/14/2003 |
| 103 | 32-A044-171 | | | No initial consultation | No | | Yes | Both | No | JP | David Burke, MD | 2/13/2003 |
| 104 | 32-V462-785 | 99245 | $230.00 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 3/26/2003 |
| 105 | 32-V464-937 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/27/2003 |
| 106 | 32-V466-696 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/27/2003 |
| 107 | 32-V467-828 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 4/16/2003 |
| 108 | 32-A044-524 | 99245 | $230.00 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/10/2003 |
| 109 | 32-V466-081 | 99245 | $230.09 | Accurate | Yes | 4/6 | No | | Yes | Accurate ; JP | David Burke, MD | 4/30/2003 |
| 110 | 32-V467-305 | 99214 | $71.56 | Accurate | Yes | 8/8 | No | | No | Accurate ; JP | David Burke, MD | 4/30/2003 |
| 111 | 32-V467-867 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/8/2003 |
| 112 | 32-A046-254 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate ; JP | David Burke, MD | 4/17/2003 |
| 113 | 32-A045-719 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 3/26/2003 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 114 | 32-V469-392 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate : JP | David Burke, MD | 3/26/2003 |
| 115 | 32-V470-824 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 4/8/2003 |
| 116 | 32-V473-430 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Legs | Yes | JP | David Burke, MD | 4/29/2003 |
| 117 | 32-V473-430 | 99245 | $230.09 | Accurate | No | | Yes | Legs | Yes | JP | David Burke, MD | 4/29/2003 |
| 118 | 32-V473-545 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 5/29/2003 |
| 119 | 32-V474-111 | | | No initial consultation | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 6/17/2003 |
| 120 | 32-V474-581 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate : JP | David Burke, MD | 5/28/2003 |
| 121 | 32-V475-544 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Arms | Yes | Accurate : JP | David Burke, MD | 5/13/2003 |
| 122 | 32-A046-775 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 5/6/2003 |
| 123 | 32-V476-662 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Legs | Yes | Accurate : JP | David Burke, MD | 5/28/2003 |
| 124 | 32-V477-922 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 5/29/2003 |
| 125 | 32-V477-922 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 5/29/2003 |
| 126 | 32-V477-935 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 8/27/2003 |
| 127 | 32-V478-469 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate | David Burke, MD | 7/2/2003 |
| 128 | 32-A047-897 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 5/29/2003 |
| 129 | 32-V480-869 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 6/25/2003 |
| 130 | 32-V480-547 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 6/24/2003 |
| 131 | 32-A049-954 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | JP | David Burke, MD | 7/17/2003 |
| 132 | 32-V481-843 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate : JP | David Burke, MD | 7/22/2003 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 133 | 32-V483-005 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 6/24/2003 |
| 134 | 32-A048-292 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/15/2003 |
| 135 | 32-V481-430 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 9/30/2003 |
| 136 | 32-V481-430 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 9/30/2003 |
| 137 | 32-V482-959 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/22/2004 |
| 138 | 32-A048-430 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/1/2003 |
| 139 | 32-V487-606 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 8/11/2003 |
| 140 | 32-V488-098 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/20/2003 |
| 141 | 30-V661-596 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate | David Burke, MD | 1/27/2005 |
| 142 | 32-5603-295 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/20/2003 |
| 143 | 32-V491-539 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/5/2004 |
| 144 | 32-V491-539 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/5/2004 |
| 145 | 32-V492-118 | 99245 | $230.09 | Accurate | Yes | 4/6 | Yes | Arms | Yes | Accurate ; JP | David Burke, MD | 9/26/2003 |
| 146 | 32-V494-003 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 10/8/2003 |
| 147 | 32-A051-357 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 9/23/2003 |
| 148 | 32-A051-357 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 10/1/2003 |
| 149 | 32-A051-357 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 9/23/2003 |
| 150 | 32-V492-748 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 9/23/2003 |
| 151 | 32-V496-996 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 9/9/2003 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 152 | 32-V494-561 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 9/23/2003 |
| 153 | 32-V496-071 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | JP | David Burke, MD | 10/4/2004 |
| 154 | 30-V671-503 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Legs | Yes | Accurate ; JP | David Burke, MD | 12/9/2003 |
| 155 | 32-V495-631 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 9/30/2003 |
| 156 | 32-V497-044 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 9/30/2003 |
| 157 | 32-V497-044 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 9/30/2003 |
| 158 | 32-V497-597 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 11/17/2003 |
| 159 | 32-V497-597 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 11/17/2003 |
| 160 | 32-V497-597 | 99245 | $239.09 | Accurate | Yes | 4/6 | No | | No | Accurate | David Burke, MD | 10/17/2003 |
| 161 | 32-V497-597 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 9/30/2003 |
| 162 | 32-V497-051 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 11/3/2003 |
| 163 | 32-A051-547 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 12/9/2003 |
| 164 | 32-V500-941 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 10/15/2003 |
| 165 | 32-A051-584 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 11/17/2003 |
| 166 | 32-A051-724 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 11/25/2003 |
| 167 | 32-A052-583 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 12/9/2003 |
| 168 | 32-V499-381 | 99245 | $230.09 | Accurate | No | | No | | Yes | JP | David Burke, MD | 1/5/2004 |
| 169 | 32-A052-293 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 11/25/2003 |
| 170 | 32-V499-604 | 99245 | $230.09 | Accurate | No | | Yes | Legs | Yes | JP | David Burke, MD | 10/21/2003 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 171 | 32-V500-076 | 99245 | $230.09 | Accurate | Yes | 4/6 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/5/2004 |
| 172 | 32-V500-319 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 11/17/2003 |
| 173 | 32-A052-939 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 11/10/2003 |
| 174 | 32-A052-906 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD; Abraham Lock, MD | 12/2/2003 |
| 175 | 32-A053-191 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 11/17/2003 |
| 176 | 32-A053-191 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 12/9/2003 |
| 177 | 32-A053-191 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | | | |
| 178 | 32-A053-191 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 12/9/2003 |
| 179 | 32-A052-721 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/5/2004 |
| 180 | 32-A052-601 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 11/25/2003 |
| 181 | 32-A052-601 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 11/25/2003 |
| 182 | 32-A052-805 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/5/2004 |
| 183 | 32-V502-296 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/22/2004 |
| 184 | 32-V503-960 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 12/9/2003 |
| 185 | 32-A052-970 | 99245 | $230.09 | Accurate | No | | Yes | Both | No | Accurate | David Burke, MD | |
| 186 | 32-A053-100 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | Abraham Lock, MD | 1/27/2004 |
| 187 | 32-A053-100 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | JP | Abraham Lock, MD | 1/27/2004 |
| 188 | 32-V505-458 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 12/9/2003 |
| 189 | 32-A053-976 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 12/9/2003 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 190 | 32-V507-918 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/11/2004 |
| 191 | 32-V505-361 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/5/2004 |
| 192 | 32-V506-821 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 2/11/2004 |
| 193 | 32-A054-266 | 99245 | $230.09 | JP | Yes | 8/8 | Yes | Legs | Yes | Accurate ; JP | David Burke, MD | 2/5/2004 |
| 194 | 32-A054-272 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | Abraham Lock, MD | 2/16/2004 |
| 195 | 32-V507-207 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 3/29/2004 |
| 196 | 32-V507-272 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/13/2004 |
| 197 | 32-V508-549 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/13/2004 |
| 198 | 32-V507-689 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/9/2004 |
| 199 | 32-V507-689 | | No Bill | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/5/2004 |
| 200 | 32-V513-838 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/27/2004 |
| 201 | 32-V509-061 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/19/2004 |
| 202 | 32-A054-239 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/11/2004 |
| 203 | 32-A054-239 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/19/2004 |
| 204 | 32-A055-216 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 4/19/2004 |
| 205 | 32-V510-075 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/13/2004 |
| 206 | 32-V510-738 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 2/5/2004 |
| 207 | 32-V511-155 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 2/5/2004 |
| 208 | 32-V511-155 | 99245 | $230.09 | Accurate | Yes | 4/6 | No | | Yes | Accurate ; JP | David Burke, MD | 2/5/2004 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 209 | 32-A054-758 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/22/2004 |
| 210 | 32-A055-011 | | No Bill | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 1/22/2004 |
| 211 | 32-V513-645 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 2/18/2004 |
| 212 | 32-V513-821 | 99245 | $230.09 | Accurate | Yes | 4/2 | No | | No | | | 3/1/2004 |
| 213 | 32-V514-130 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 2/11/2004 |
| 214 | 32-V517-728 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 3/17/2004 |
| 215 | 32-V517-728 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 5/10/2004 |
| 216 | 32-V515-425 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/19/2004 |
| 217 | 32-V515-425 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 3/9/2004 |
| 218 | 32-V516-409 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 4/26/2004 |
| 219 | 32-V516-409 | | | No initial consultation | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 4/27/2004 |
| 220 | 32-A055-799 | | | No initial consultation | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/8/2004 |
| 221 | 32-5609-911 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 3/17/2004 |
| 222 | 32-V521-053 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/8/2004 |
| 223 | 32-V522-568 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 5/10/2004 |
| 224 | 32-V524-300 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/19/2004 |
| 225 | 32-V524-300 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/19/2004 |
| 226 | 32-V521-969 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 4/28/2004 |
| 227 | 32-V622-544 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 5/5/2004 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 228 | 32-V522-077 | 99245 | $230.09 | Accurate | Yes | 4/6 | Yes | Both | No | JP | Syed Jalal, MD | 5/15/2004 |
| 229 | 32-V524-211 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 6/18/2004 |
| 230 | 32-V524-211 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 6/18/2004 |
| 231 | 32-A056-573 | 99245 | $230.09 | Accurate | No | | Yes | Legs | No | Accurate | David Burke, MD | 6/23/2004 |
| 232 | 32-A056-573 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 6/23/2004 |
| 233 | 32-V524-349 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 6/2/2004 |
| 234 | 32-V524-617 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 5/3/2004 |
| 235 | 32-A056-954 | 99245 | $230.09 | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 5/5/2004 |
| 236 | 32-V525-094 | | | No initial consultation | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 6/2/2004 |
| 237 | 32-A056-645 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 5/20/2004 |
| 238 | 32-V525-800 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 6/21/2004 |
| 239 | 32-V526-011 | | | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 5/10/2004 |
| 240 | 32-V527-028 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 7/13/2004 |
| 241 | 32-A056-821 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 5/26/2004 |
| 242 | 32-A056-821 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 6/8/2004 |
| 243 | 32-A056-821 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 6/8/2004 |
| 244 | 32-V527-831 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 8/5/2004 |
| 245 | 32-V527-983 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 6/10/2004 |
| 246 | 32-V531-271 | | | No initial consultation | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 7/8/2004 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 247 | 32-V529-157 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | | Yes | Accurate ; JP | David Burke, MD | 7/26/2004 |
| 248 | 32-V532-830 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 6/18/2004 |
| 249 | 32-V532-830 | 99245 | $230.09 | Accurate | No | | | | Yes | JP | David Burke, MD | 6/2/2004 |
| 250 | 32-V531-766 | | | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 6/29/2004 |
| 251 | 32-V531-053 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 5/25/2004 |
| 252 | 32-V532-139 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 6/29/2004 |
| 253 | 32-V531-562 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 7/20/2004 |
| 254 | 32-V533-207 | 99245 | $230.09 | Accurate | No | | No | | No | | David Burke, MD | |
| 255 | 32-A057-163 | | | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 6/18/2004 |
| 256 | 32-A057-163 | | | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 7/13/2004 |
| 257 | 32-V535-980 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/7/2004 |
| 258 | 32-V535-980 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/13/2004 |
| 259 | 32-A057-071 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/20/2004 |
| 260 | 32-V534-200 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/13/2004 |
| 261 | 32-V535-680 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/24/2004 |
| 262 | 32-V535-680 | 99245 | $230.09 | Accurate | No | | No | | No | | | |
| 263 | 32-V551-523 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 7/16/2004 |
| 264 | 32-V535-841 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 7/14/2004 |
| 265 | 32-V536-210 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/2/2004 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 266 | 32-V536-357 | | | No initial consultation | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 8/17/2004 |
| 267 | 32-V536-743 | | | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 7/7/2004 |
| 268 | 32-V536-961 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 9/24/2004 |
| 269 | 32-V536-961 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/2/2004 |
| 270 | 32-V537-167 | 99245 | $230.09 | Accurate | Yes | 4/2 | Yes | Legs | No | Accurate ; JP | David Burke, MD | 9/27/2004 |
| 271 | 32-V537-546 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 10/26/2004 |
| 272 | 32-5613-107 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/17/2004 |
| 273 | 32-A057-379 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/16/2004 |
| 274 | 32-A057-379 | | | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 8/4/2004 |
| 275 | 32-V539-607 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/24/2004 |
| 276 | 32-V542-259 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 9/14/2004 |
| 277 | 32-V546-228 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 8/30/2004 |
| 278 | 32-V542-332 | | | No initial consultation | No | | Yes | Both | Yes | JP | David Burke, MD | 11/9/2004 |
| 279 | 32-V542-386 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | JP | David Burke, MD | 10/19/2004 |
| 280 | 32-V547-657 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Inwood | David Burke, MD | 11/16/2004 |
| 281 | 32-V547-657 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Inwood ; JP | David Burke, MD | 10/7/2004 |
| 282 | 32-V549-023 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | JP | David Burke, MD | 10/8/2004 |
| 283 | 32-A057-884 | 99245 | $230.09 | Inwood | Yes | 8/8 | Yes | Both | Yes | JP | David Burke, MD | 12/20/2004 |
| 284 | 32-V546-412 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | JP | David Burke, MD | 10/19/2004 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 285 | 32-V546-412 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | JP | David Burke, MD | 9/27/2004 |
| 286 | 32-V551-534 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 11/23/2004 |
| 287 | 32-V547-828 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | JP | David Burke, MD | 11/16/2004 |
| 288 | 32-V547-828 | 99245 | $230.09 | Inwood | Yes | 8/8 | No | | Yes | JP | David Burke, MD | 10/18/2004 |
| 289 | 32-V548-297 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | No | Accurate ; JP | David Burke, MD | 11/1/2004 |
| 290 | 32-V548-361 | 99245 | $230.09 | Inwood | Yes | 8/8 | Yes | Both | Yes | Inwood | David Burke, MD | 11/23/2004 |
| 291 | 32-V550-289 | 99245 | $230.09 | Inwood | Yes | 8/8 | No | | Yes | Inwood | David Burke, MD | 11/10/2004 |
| 292 | 32-V540-631 | 99245 | $230.09 | Accurate | No | | No | | No | Accurate | David Burke, MD | |
| 293 | 32-V554-039 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 3/8/2005 |
| 294 | 32-V555-159 | 99245 | $230.09 | Inwood | Yes | 8/8 | Yes | Both | Yes | Inwood | David Burke, MD | 1/13/2005 |
| 295 | 32-V556-569 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Inwood | David Burke, MD | 1/27/2005 |
| 296 | 32-V556-569 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Inwood | David Burke, MD | 1/27/2005 |
| 297 | 32-V558-796 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Inwood | David Burke, MD | 2/3/2005 |
| 298 | 32-V557-100 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 1/18/2005 |
| 299 | 32-V561-192 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Arms | Yes | Accurate | David Burke, MD | 1/18/2005 |
| 300 | 32-V559-116 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 2/3/2005 |
| 301 | 32-V561-847 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate ; JP | David Burke, MD | 4/6/2004 |
| 302 | 32-V560-822 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 3/7/2005 |
| 303 | 32-V560-822 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 3/8/2005 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 304 | 32-A058-281 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 3/8/2005 |
| 305 | 32-A058-281 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 2/7/2005 |
| 306 | 32-A058-281 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Accurate | David Burke, MD | 2/7/2005 |
| 307 | 32-V563-331 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 3/8/2005 |
| 308 | 32-V545-559 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 1/13/2005 |
| 309 | 32-V563-434 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 2/8/2005 |
| 310 | 32-V564-695 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Accurate | David Burke, MD | 2/3/2005 |
| 311 | 32-V564-695 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Accurate | David Burke, MD | 2/3/2005 |
| 312 | 32-V564-695 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Accurate | David Burke, MD | 2/3/2005 |
| 313 | 32-V564-695 | 99245 | $230.09 | Accurate | No | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 2/3/2005 |
| 314 | 32-V565-423 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 3/7/2005 |
| 315 | 32-V566-505 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 4/5/2005 |
| 316 | 32-V566-125 | 99245 | $230.09 (x2) | Accurate ; Quality | Yes | 8/8 | Yes | Both | Yes | Accurate ; JP | David Burke, MD | 4/25/2005 |
| 317 | 32-V571-596 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | | Accurate | David Burke, MD | 3/17/2005 |
| 318 | 32-V566-740 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | yes | Accurate | David Burke, MD | 3/8/2005 |
| 319 | 32-V567-268 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Arms | Yes | Accurate | David Burke, MD | 3/28/2005 |
| 320 | 32-V567-426 | 99245 | $230.09 | Accurate | Yes | 4/6 | Yes | Arms | Yes | Accurate | David Burke, MD | 4/18/2005 |
| 321 | 32-V567-570 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 3/23/2005 |
| 322 | 32-V571-083 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 5/3/2005 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 323 | 32-V570-795 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Accurate | David Burke, MD | 5/2/2005 |
| 324 | 30-V776-867 | 99245 | $230.09 (x2) | Accurate ; Quality | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD | 7/1/2005 |
| 325 | 32-V577-114 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Accurate ; Quality | David Burke, MD | 6/6/2005 |
| 326 | 32-V577-114 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Quality | David Burke, MD | 5/25/2005 |
| 327 | 32-V577-987 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 8/1/2005 |
| 328 | 32-V578-125 | 99245 | $230.09 | Quality | Yes | 4/6 | No | | No | Quality | David Burke, MD | 8/29/2005 |
| 329 | 32-V580-614 | 99245 | $230.09 | Quality | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD | 7/1/2005 |
| 330 | 32-V580-759 | 99245 | $230.09 (x2) | Accurate ; Quality | Yes | 8/8 | No | | Yes | Quality | David Burke, MD | 7/1/2005 |
| 331 | 32-V581-461 | 99245 | $230.09 (x2) | Accurate ; Quality | No | | Yes | Both | yes | Quality | David Burke, MD | 7/1/2005 |
| 332 | 32-V581-461 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Quality | David Burke, MD | 7/1/2005 |
| 333 | 32-V582-724 | 99245 | $230.09 | Accurate | No | | Yes | Arms | Yes | Quality | David Burke, MD | 7/1/2005 |
| 334 | 32-V582-445 | 99245 | $230.09 (x2) | Accurate ; Quality | Yes | 8/8 | Yes | Both | Yes | Accurate ; Quality | David Burke, MD | 7/11/2005 |
| 335 | 32-V587-745 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Quality | David Burke, MD | 8/29/2005 |
| 336 | 32-V587-241 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | No | Accurate | David Burke, MD | 8/23/2005 |
| 337 | 32-V587-241 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Accurate | David Burke, MD | 8/23/2005 |
| 338 | 32-V585-284 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD | 9/9/2005 |
| 339 | 32-V585-436 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Quality | David Burke, MD | 8/23/2005 |
| 340 | 32-V587-769 | 99245 | $230.09 (x2) | Accurate ; Quality | Yes | 8/8 | Yes | Arms | Yes | Quality | David Burke, MD | 10/3/2005 |
| 341 | 32-V588-737 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Quality | David Burke, MD | 9/21/2005 |

RICO Appendix

| RICO Event | Claim Number | Consult Code | Consult Charge | Consult Billing Entity | NCV | Motor/Sensory Nerves | SSEP | Arms/Legs | BAER | Tests Billing Entity | Doctor for Tests | Date of Mailing * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 342 | 32-V593-226 | 99245 | $230.09 | Accurate | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD; Remer, Stuart, | 9/27/2005 |
| 343 | 32-V592-162 | | | No initial consultation | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD | 11/17/2005 |
| 344 | 32-V594-494 | 99245 | $230.09 | Quality | Yes | 8/8 | No | | Yes | Quality | David Burke, MD | 2/11/2006 |
| 345 | 32-V598-418 | 99245 | $230.09 (x2) | Accurate ; Quality | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD | 12/20/2005 |
| 346 | 30-V813-299 | 99245 | $230.09 (x2) | Accurate ; Quality | No | | No | | No | | | |
| 347 | 32-V611-984 | 99245 | $230.09 | Accurate | No | | Yes | Both | Yes | Quality | David Burke, MD | 3/24/2006 |
| 348 | 32-V617-280 | 99245 | $230.09 (x2) | Accurate ; Quality | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD | 5/8/2006 |
| 349 | 32-V619-142 | 99245 | $230.09 | Accurate | Yes | 8/8 | No | | Yes | Quality | David Burke, MD | 6/16/2006 |
| 350 | 32-V620-868 | 99245 | $230.09 | Quality | Yes | 8/8 | Yes | Both | Yes | Quality | David Burke, MD | 6/23/2006 |